[No. B222751. Second Dist., Div. Eight. June 6, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
BENJAMIN FRANDSEN, Defendant and Appellant.

**COUNSEL**

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RUBIN, J.**—Benjamin Frandsen appeals from the judgment following his conviction for second degree murder and involuntary manslaughter. We affirm.

### FACTS AND PROCEEDINGS

Shane Huang grew dozens of marijuana plants in a house in Canoga Park. In 2002, murder victim Ben Wertzberger lived in the house rent free in return for taking care of the plants. In the fall of 2002, Wertzberger left Huang's employment and moved to Las Vegas. In November of that year, murder victim Adar Neeman flew from his home in Israel to Los Angeles to visit his boyhood friend, Wertzberger.[1] Wertzberger drove from Las Vegas to Los Angeles to pick up Neeman and host him during his American visit.

On December 1, 2002, Huang telephoned appellant Benjamin Frandsen at home. Huang told appellant there was an emergency at Huang's marijuana-growing house requiring appellant to help Huang. Appellant and his room-mate drove to Huang's house. When appellant arrived, Huang told appellant

---

[1] In the record, Adar Neeman's last name is also spelled as NèEman. We use the most frequent spelling in the record of Neeman throughout the opinion.

that someone had broken into the house overnight and Huang feared the intruder might still be inside. Appellant and his roommate entered the house using clearing techniques they had learned during their military service. Once inside, they saw a broken window and discovered some marijuana plants had been stolen, but found no intruder.

The next day, December 2, 2002, Huang returned to the house and claimed he discovered Wertzberger and Neeman breaking into it. Detaining Wertzberger and Neeman at knifepoint, Huang telephoned several associates, including appellant, to tell them he had caught the previous night's intruders and to ask them to come to the house, thus beginning a more than seven-hour saga of false imprisonment, threats, torture, and death. Arriving at Huang's house, appellant wore attire, including combat boots, a leather jacket, and gloves, intended to intimidate Huang's captives. Wertzberger and Neeman were sitting on the couch while Huang waved a machete at them, proclaiming to all who were gathered that "I want to fuck these guys up." Telling them "I know you motherfuckers stole my stuff," Huang bound their hands and feet with duct tape.[2] Leaving their associates in charge, Huang and appellant left the house and drove to The Home Depot, where they bought a shovel, rope, and tarp. They then returned to the house.

During the course of Wertzberger and Neeman's more-than-seven-hour captivity, Huang took Wertzberger from the living room to a bathroom to "interrogate" him. During Wertzberger's interrogation, Huang and appellant's associates who had remained behind in the living room could hear water splashing in the bathroom and Wertzberger screaming. Emerging from the bathroom, Huang announced that Wertzberger admitted he had stolen the missing marijuana plants and that Neeman had agreed to compensate Huang for the stolen plants. To guarantee payment, Wertzberger and Neeman gave Huang the addresses and phone numbers of their families in Israel. Appellant and Huang drove to a restaurant, where they gave the families' contact information to a friend who spoke Hebrew. The friend called the families in Israel and confirmed the information was correct. As Huang and appellant left the restaurant, their friend overheard Huang say "I don't want dirt on my hands." Appellant replied "I'll do it."

Appellant and Huang returned to the house. Huang, who appeared calmer after confirming the contact information for Neeman's and Wertzberger's families, told his gathered associates that he had settled his dispute with the two men. He told the group that he and appellant were going to drive Wertzberger and Neeman, whose hands and feet had been untied, to Las

---

[2] Appellant later told the FBI that Neeman and Wertzberger were already bound when he arrived.

Vegas to ensure Wertzberger and Neeman did not call the police upon their release. Except for appellant, everyone whom Huang had summoned to the house that day departed.

Once Huang and appellant were by themselves with Wertzberger and Neeman, Huang took Wertzberger into the bathroom once again, leaving appellant and Neeman sitting alone on the couch. Hearing noises coming from the bathroom, including a snapping sound which later forensic evidence suggested may have been Huang breaking Wertzberger's neck, Neeman bolted upright from the couch. Wielding a "shiny object" which likely was a foot-long metal bong, Neeman, seemingly scared for his life, ran toward appellant. When Neeman got within striking distance, appellant threw up his arm and hit Neeman in the neck, knocking the wind out of him and dropping him to the floor. Huang emerged from the bathroom, unaccompanied by Wertzberger who had fallen silent, and put a plastic bag over Neeman's head, twisting it tight until Neeman suffocated.

Appellant and Huang put their victims' bodies in the trunk of a car and drove out to the desert toward Las Vegas, where they buried the bodies. Appellant and Huang then continued to Las Vegas, where they bought clothing with Neeman's credit card to make it appear as if Neeman was still alive. A day or two later, they returned to Los Angeles.

Wertzberger's and Neeman's families in Israel reported to American authorities that their sons were missing when the families' repeated efforts to contact the young men failed. In September 2003, the FBI found Wertzberger's and Neeman's bodies in the shallow desert grave in which Huang and appellant had buried them. An autopsy established Neeman's cause of death was blunt-force injuries to his neck, resulting in a crushed larynx and fractured cervical spine. The advanced decomposition of Wertzberger's body prevented the coroner from determining the cause of Wertzberger's death, but the coroner judged it to be homicide in light of his burial with Neeman in a shallow desert grave.

The People charged Huang and appellant with murdering Wertzberger and Neeman. Because appellant admitted involvement in the events immediately preceding Neeman's and Wertzberger's deaths—which included holding the men captive and striking Neeman in the neck—but accused Huang of delivering the coup de grâce to each victim by killing Wertzberger in the bathroom and suffocating Neeman, the trial court severed appellant's trial from Huang's. Following separate trials, juries convicted appellant and Huang of two counts of murder each. In September 2007, we reversed appellant's murder convictions because of instructional error. (*People v.*

*Frandsen* (Sept. 11, 2007, B191189) [nonpub. opn.].)[3] The People retried appellant on two counts of murder. The retrial resulted in the jury convicting appellant of second degree murder of Neeman and involuntary manslaughter of Wertzberger. The court sentenced appellant to state prison for 19 years to life. This appeal followed.

## DISCUSSION

### 1. *Imperfect Self-defense and a Victim's "Sudden Escalation"*

Appellant concedes he was guilty of false imprisonment and battery for his admitted participation in keeping Neeman captive. He asserts, however, that he struck Neeman in the neck without intending to kill him. Appellant claims he reflexively struck Neeman only to protect himself from the metal bong Neeman was holding as the terror-stricken Neeman rushed toward him when they heard a snapping sound from Huang and Wertzberger in the bathroom. Because of purported jury misinstruction guiding the jury's understanding of his blow against Neeman, appellant contends the jury erred in convicting him of second degree murder.

During its deliberations, the jury asked the court the following question: "Is the defendant allowed to imperfect self-defense as the aggressor?" After consulting with counsel, the trial court answered the jury's question by instructing on mutual combat and imperfect self-defense. The court started by explaining an aggressor's narrowly circumscribed right to self-defense under mutual combat: "A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if: [¶] He actually and in good faith tries to stop fighting; and [¶] He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; [¶] and in cases of mutual combat only [¶] He gives his opponent a chance to stop fighting. [¶] If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. . . ."

The court concluded its mutual combat instruction with the following sentence, which appellant calls the "sudden escalation exception": "If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting."

The court then instructed on imperfect self-defense. It told the jury: "A defendant who, through his own wrongful conduct, such as initiating a

---

[3] Our colleagues in Division One affirmed Huang's murder convictions in October 2007 (*People v. Huang* (Oct. 2, 2007, B192819) [nonpub. opn.]).

physical assault or committing a felony, has created circumstances under which his adversary's attack or pursuit is legally justified may not invoke unreasonable self-defense. [¶] Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is legally justified in resorting to self-defense against the defendant. But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant. [¶] As used in this instruction, a 'felony' includes false imprisonment as defined elsewhere in these instructions."[4]

The court's imperfect self-defense instruction did not include what appellant calls a sudden-escalation exception analogous to the exception in the mutual combat instruction's final sentence. Appellant contends that the imperfect self-defense instruction thus erroneously "failed to specify the sudden escalation concept applied to imperfect self-defense."

The court did not misinstruct the jury. First, escalation did not apply factually. Appellant asserts "things had cooled down" as he sat alone with Neeman on the couch when he "suddenly found himself facing [Neeman] rushing him with a silver object (possibly a 12-inch bong)." But it was not Neeman who escalated matters; escalation arose from appellant's accomplice, Huang, murdering Wertzberger in the bathroom, triggering Neeman to arise to defend himself and/or Wertzberger. Appellant was therefore not an aggressor who was trying to withdraw from a fight he had started whose withdrawal was thwarted by a combative victim who refused to stop fighting; to the contrary, by remaining in the living room with Neeman while Huang took Wertzberger to the bathroom, appellant was participating in on-going criminality.

■ Second, even if Neeman had escalated matters by wielding a metal bong as he charged appellant, appellant cites no authority that the escalation exception applies to imperfect self-defense. Indeed, the law is to the contrary, for as the initial aggressor and with Neeman having acted lawfully, appellant may not rely on imperfect self-defense. (*People v. Seaton* (2001) 26 Cal.4th 598, 664 [110 Cal.Rptr.2d 441, 28 P.3d 175] ["Because . . . defendant's testimony showed him to be the initial aggressor and the victim's response legally justified, defendant could not rely on unreasonable self-defense as a ground for voluntary manslaughter."].) As our Supreme Court explained in

---

[4] See, e.g., *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179–1180 [39 Cal.Rptr.3d 433] ("Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant. [Citation.] But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant.").

*In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574]: "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*Id.* at p. 773, fn. 1.)

The *Christian S.* court illustrated its point with the example of a felon fleeing a police officer. Regardless of how sincerely the felon may believe he needs to resort to self-defense to protect himself from the officer, the felon may not do so because his felonious conduct denies him the right to resort to self-defense. *Christian S.* stated: "[T]he imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*In re Christian S., supra*, 7 Cal.4th at p. 773, fn. 1.)

■ *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834 [74 Cal.Rptr.3d 416] is instructive. There, we held a defendant may not use force to defend himself against a victim's resort to lawful deadly force. The defendant in that case, armed with a knife and looking to steal drugs, broke into the sleeping victim's hotel room. During his trial for attempted murder, the defendant testified he knifed the victim in self-defense when the victim awoke, leapt out of bed, and pushed the defendant up against a wall. (*Id.* at p. 834.) Rejecting the defendant's assertion of imperfect self-defense, we explained: "A person who kills or tries to kill someone because he actually, but unreasonably, believes he needs to defend himself from imminent death or great bodily injury is deemed to have acted without malice. [Citations.] Under this unreasonable self-defense theory, the crime committed is manslaughter or attempted manslaughter, not murder or attempted murder. [Citation.] However, a defendant who—through his own wrongful conduct, such as initiating a physical assault or committing a felony—has created circumstances under which his adversary's attack or pursuit is legally justified may not invoke unreasonable self-defense." (*Id.* at pp. 833–834.)

Only when the victim resorts to *unlawful* force does the defendant-aggressor regain the right of self-defense. Comparing *Szadziewicz* with our decision in *People v. Vasquez, supra*, 136 Cal.App.4th 1176, illuminates the distinction. There, the wheelchair-bound and armed defendant was arguably looking for a fight when he publicly accused his victim in front of friends of having repeatedly raped the defendant's younger brother. (*Id.* at pp. 1178–1179.) When the victim charged the defendant and began to choke

him, the defendant pulled out his gun and shot the victim. Emphasizing that the victim's escalation to deadly force was triggered solely by the defendant's verbal taunts, we found the defendant could plead imperfect self-defense even if he had intended his taunts to provoke his victim into attacking him so that he might have an excuse to shoot the victim; because the defendant's verbal aggression, no matter how intentionally provocative, had not been physical, the victim had no right to resort to deadly force. (See also *People v. Quach* (2004) 116 Cal.App.4th 294, 301 [10 Cal.Rptr.3d 196] [" 'Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. . . . If the victim uses such force, the aggressor's right of self-defense arises. . . .' "].)

We explained: "Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant. [Citation.] But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*People v. Vasquez, supra*, 136 Cal.App.4th at pp. 1179–1180, original italics.) Our explanation rested on our Supreme Court's decision in *People v. Randle* (2005) 35 Cal.4th 987 [28 Cal.Rptr.3d 725, 111 P.3d 987], later overruled on another point by *People v. Chun* (2009) 45 Cal.4th 1172, 1201 [91 Cal.Rptr.3d 106, 203 P.3d 425], a case that permitted auto burglars to resort to deadly self-defense when they tried to escape from the automobile owner who pursued them across town to deliver deadly street justice.

We explained: "In [*Randle*], the defendant and his accomplice were burglarizing a car when a relative of the car's owner came upon them. [Citation.] The defendant and his accomplice fled, but the relative and car's owner chased them down and began to beat the accomplice severely. To save his accomplice from serious injury or even death, the defendant pulled out his gun and killed the car owner's relative. [Citation.] [¶] On review, the Supreme Court held the defendant was entitled to a jury instruction on imperfect defense of another. [Citation.] As in our case, both the defendant in *Randle* and [wheelchair bound Vasquez] were up to no good—plainly so in *Randle* who was obviously committing a crime, and arguably so with [Vasquez] when he invited [his victim] to the alley [hoping to provoke a fight]. And both the defendant in *Randle* and [Vasquez] generally set in motion the circumstances that led their victims to attack them. [Citation.] But in each case, the evidence suggested the victims, not the defendants, used unlawful force first. Accordingly, [Vasquez] was entitled to assert imperfect self-defense." (*People v. Vasquez, supra*, 136 Cal.App.4th at p. 1180.)

▮ Distilling the essence of the foregoing authorities, we conclude the following: Victim Neeman had the right to use force to try to escape Huang

and appellant's unlawful, hours' long imprisonment of Neeman and Wertzberger, and to protect himself and Wertzberger when Huang attacked Wertzberger in the bathroom. Thus, when Neeman charged appellant upon the sound of Huang snapping Wertzberger's neck, appellant had the option of (1) fleeing, (2) stepping out of the way, or (3) taking what he had coming to him from Neeman. Appellant did not, however, have the right to defend himself from Neeman's lawful resort to self-defense and the defense of Wertzberger. (Accord, *In re Christian S., supra,* 7 Cal.4th at p. 773, fn. 1 ["[T]he imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense."]; *People v. Hardin* (2000) 85 Cal.App.4th 625, 634 [102 Cal.Rptr.2d 262] [In defense of home, victim homeowner statutorily presumed to be in reasonable fear of imminent deadly danger from home intruder; imperfect self-defense " 'is not available . . . if the defendant [intruder] by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force.' "]; *People v. Randle, supra,* 35 Cal.4th at pp. 992–993, 1002–1003 [car burglary defendant entitled to use deadly force in imperfect defense of another against burglary victim administering deadly street justice].) The trial court here therefore did not misinstruct the jury when it omitted a "sudden escalation" exception to its imperfect self-defense instruction.[5]

 Appellant also contends the court denied him proper notice and due process when it instructed the jury on mutual combat and imperfect self-defense after the jury started deliberating. In support, he cites Penal Code section 1093.5, which states "In any criminal case which is being tried before the court with a jury, all requests for instructions on points of law must be made to the court and all proposed instructions must be delivered to the court before commencement of argument." His contention ignores, however, that part of section 1093.5 which states, "However, if, during the argument, issues are raised which have not been covered by instructions . . . the court may, on request of counsel, give additional instructions on the subject matter thereof." He also ignores the well-established principle that the court may provide additional instruction based on jurors' questions. (See, e.g., *People v. Eid* (2010) 187 Cal.App.4th 859, 881–882 [114 Cal.Rptr.3d 520]; Pen. Code, § 1138.) Accordingly, the court's authority to give the additional instructions

---

[5] Appellant also contends (1) the mutual combat and imperfect self-defense instructions, by including the phrases "initial aggressor," "wrongful conduct," and "circumstances," were unconstitutionally vague; (2) the court erred in instructing on mutual combat because no facts showed appellant and Neeman agreeing to engage in mutual combat; and (3) the court erred in not instructing on the difference between misdemeanor and felony false imprisonment. Because appellant did not raise these purported errors below, he has forfeited the points on appeal. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1138 [40 Cal.Rptr.3d 118, 129 P.3d 321] ["Generally, a claim of instructional error is not cognizable on appeal if the instruction is correct in law and the defendant fails to request a clarification instruction."].)

was clear. Moreover, appellant requested and received additional time to prepare further argument to the jury on the meaning of the added instructions to appellant's defense. (Cf. *U.S. v. Gaskins* (9th Cir. 1988) 849 F.2d 454, 458 [late instructions can be prejudicial if party prevented from arguing its defense or substantially misled in formulating its argument].) Thus, no due process or notice violation occurred.

## 2. *Witness Griffin's Prior Consistent Statement*

Lyndsay Griffin was a close friend of appellant who saw him a few days after the Neeman and Wertzberger murders. During the prosecution's direct examination of her at trial, she testified appellant told her he had struck an intruder in Huang's house. Telling her he had taken a deep breath when the man whom he did not name came toward him, he motioned with his arm to show her how he had delivered the blow. Based on his description, she testified that she told him "This sounds like self-defense." Upon redirect, the prosecutor asked: "Is there any reason that you never mentioned to the F.B.I., in any of your interviews, that you thought it was self-defense? . . . Is this the first time you've brought up the words 'self-defense'? [¶] A. Not to my knowledge. I told him at the time. I said 'You should turn yourself in.' That should be in the report. 'This sounds like self-defense to me.' " Insisting that she told the FBI everything she had said to appellant, she asserted the FBI's records should contain her statement that she told appellant his conduct seemed like self-defense to her.

Appellant's counsel thereafter offered Griffin's testimony from appellant's first trial as a prior consistent statement. Hoping to rebut the prosecutor's insinuation that she had fabricated her current trial testimony that she believed appellant acted in self-defense, counsel offered the following testimony from the first trial: "[Q]. Did you express to him any concern that this is going to come back to him? [A]. Yes, I did. I expressed concern that, you know, these things don't go away; that, you know, if it—if it was indeed a self-defense situation, that he should just turn himself in, and he should just deal with it, because it's going to come up at some point."

The court excluded Griffin's prior testimony as inadmissible hearsay. It reasoned that Griffin's assessment of whether appellant's description of his striking Neeman constituted self-defense was irrelevant. The court asked defense counsel: "Ms. Griffin made it clear that the whole issue of self-defense was her opinion based upon what was said, her state of mind. So tell me how her state of mind is relevant." Defense counsel answered that Griffin's state of mind was relevant because "It's what she understood that he was telling her." Defense counsel was mistaken. What mattered for appellant's defense was *his* conduct and *his* state of mind. Griffin's opinion

whether appellant acted in self-defense is neither here nor there and invaded the jury's domain. Accordingly, appellant's contention that the court erred in excluding Griffin's testimony from appellant's first trial fails. Even though some evidence of Griffin's view of the defense came in and arguably she was impeached on this collateral matter on cross-examination, the trial court's ruling to cut off this wandering inquiry was well within its discretion.

### 3. *No Prosecutorial Misconduct*

During closing argument, the prosecutor asserted no evidence supported Huang's accusation that Neeman and Wertzberger had burglarized his house. The prosecutor argued, Huang "conveyed to all of the people he called over to the house, that these were the people that had committed the burglary of the marijuana . . . [but] there is no evidence that they committed the burglary . . . ." Appellant contends the prosecutor committed misconduct by misrepresenting the record because evidence did point to Neeman and Wertzberger having burglarized Huang's house. For example, Wertzberger knew about the marijuana because he had taken care of the plants for Huang in the past, and other evidence suggested Wertzberger needed money to pay his debts thus giving him a motive to steal the marijuana for resale. Additionally, Wertzberger admitted stealing the plants after Huang's bathroom "interrogation" of him.

In response to defense counsel's objection that the prosecutor was misrepresenting the record, the court ruled that Neeman and Wertzberger's alleged burglary of Huang's house was irrelevant to the charges against appellant; what mattered, the court had previously explained, was Huang had apparently convinced his associates, including appellant, that Neeman and Wertzberger were the burglars. That belief, whether accurate or not, underpinned appellant's defense that Neeman and Wertzberger were, as presumed burglars, the initial aggressors, and the court permitted appellant to argue his belief to the jury. Hence, even if the prosecutor overstated her argument by asserting no evidence suggested Neeman and Wertzberger had burglarized Huang's house, the error was harmless. As the prosecutor noted with the court's assent when the matter of the burglars' identity arose early in the trial: "[Prosecutor:] I don't believe it's relevant, whether he really burglarized the house . . . . What's relevant is that Shane Huang believed he burglarized the house. . . . That has been established. . . . [¶] I don't believe we're here to litigate who actually committed the burglary . . . . [Court:] Okay. I think it's pretty far afield at this point. I mean, the—who broke into the house on the first day is basically irrelevant. It's the state of mind of the perpetrators [(appellant and Huang)], not the state of mind of the victims that are important here. So I—I don't see relevance of whether Mr. [Wertzberger] [had a motive to steal the marijuana] showing on whether or not [appellant] is guilty or not guilty of killing him."

Appellant was being tried for murder; the victims were not being tried for burglary. Thus, even if Huang had caught Neeman and Wertzberger burglarizing his home, that burglary had no bearing on appellant's participation in killing them more than eight hours later. And therefore, whether any evidence existed to show they were, contrary to the prosecutor's argument, in fact the burglars was equally immaterial, making the prosecutor's arguable overstatement at most harmless.

## 4. *Contrived Self-defense Instruction*

The court instructed the jury with CALCRIM No. 3472. It states: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Appellant contends the court erred giving that instruction.

■ Appellant's contention is not well taken. First, defense counsel did not object, therefore forfeiting the error, if any, on appeal. (*People v. Guerra, supra*, 37 Cal.4th at p. 1138 ["Generally, a claim of instructional error is not cognizable on appeal if the instruction is correct in law and the defendant fails to request a clarification instruction."].) Second, appellant's assertion that no substantial evidence supported the instruction does not warrant our finding reversible error because the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381 [37 Cal.Rptr.2d 596].)

## 5. *Upper Term for Involuntary Manslaughter*

■ The court imposed a four-year upper term for appellant's conviction for involuntary manslaughter of Wertzberger. Asserting the court imposed the upper term based on facts not submitted to the jury, appellant contends the court violated appellant's constitutional right to have a jury find every fact used in imposing punishment. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 470 [147 L.Ed.2d 435, 120 S.Ct. 2348]; *People v. Black* (2007) 41 Cal.4th 799, 812 [62 Cal.Rptr.3d 569, 161 P.3d 1130] [constitutional right to have the jury find all facts legally essential to punishment].) He also contends violation of ex post facto principles. Appellant recognizes, however, that our Supreme Court has found to the contrary, and that precedent binds us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) In March 2007, the California Legislature amended Penal Code section 1170, subdivision (b) of the determinate sentencing law to read: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (Pen. Code, § 1170, subd. (b).) Several months later in July 2007 in *People v. Sandoval* (2007) 41 Cal.4th 825 [62 Cal.Rptr.3d

588, 161 P.3d 1146], our Supreme Court judicially adopted the amendment to section 1170 for retroactive application and further held "the prohibition on ex post facto laws applies only to statutory enactments, not to judicial decisions" in upholding a trial court's authority to impose an upper term sentence based on facts found by the court. (*Sandoval*, at pp. 838–839, 853–855; see also *People v. Jones* (2009) 178 Cal.App.4th 853, 866–867 [100 Cal.Rptr.3d 780]; *People v. Wilson* (2008) 164 Cal.App.4th 988, 991 [79 Cal.Rptr.3d 631].) In light of section 1170 as construed by *Sandoval*, the trial court's imposition of the upper-term sentence in 2010, after the amendment to section 1170 and publication of *Sandoval* in 2007, is lawful.

## DISPOSITION

The judgment is affirmed.

Bigelow, P. J., and Flier, J., concurred.

A petition for a rehearing was denied July 6, 2011, and appellant's petition for review by the Supreme Court was denied September 21, 2011, S194812. Werdegar, J., did not participate therein.