Filed 10/18/13  P. v. Narcisse CA1/4

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>DJOLIBA NARCISSE,<br><br>       Defendant and Appellant. | A137283<br><br>(Contra Costa County<br>Super. Ct. No. 051208255) |

A jury convicted defendant Djoliba Narcisse of mayhem (Pen. Code, § 203)[1] and assault with a deadly weapon (§ 245, subd. (a)(1)) after he stabbed a female acquaintance outside a bar.  The jury also found various enhancements to be true, and the trial court sentenced him to nine years in prison.  On appeal, and for the first time, Narcisse contends that the trial court erred in instructing the jury that self-defense is unavailable to someone who provokes a fight with the intent to create an excuse to use force.  He contends that the instruction was unsupported by the evidence and may have misled the jury.  We affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Narcisse stabbed a woman outside a Pinole bar in the early morning hours of November 11, 2011, cutting her from the middle of her forehead, through her left ear, and down to her neck behind her ear.  The incision was life threatening.  It caused a

---

[1] All statutory references are to the Penal Code.

1

significant loss of blood, required surgery, and left the victim with a visible scar and hearing problems. At trial, witnesses provided contrasting versions of exactly what happened.

According to the victim, she first encountered Narcisse the previous summer at the same bar when she was there with her companion. On that occasion, Narcisse followed the victim and her companion out of the bar, asked the victim for her phone number, persisted in soliciting the number even after the victim refused to give it, and prevented the victim and her companion from getting into their car until someone who was with Narcisse persuaded him to give up. The victim stated that she saw Narcisse about two other times at the same bar, these times without incident, before the night of the stabbing.

The victim testified that on the night of the stabbing, Narcisse bumped into her inside the bar "with force, pow" while she was standing still. The victim told him, " 'That's not how you say excuse me to somebody,' " and Narcisse responded, " 'If you want to make it up out of here alive, I suggest you leave now.' " The victim testified that she was somewhat upset by the encounter but did not take Narcisse seriously. She went outside to calm down, smoked a cigarette, then reentered the bar.

The victim and her companion decided to leave the bar around 1:45 a.m., and they saw Narcisse holding a knife and arguing loudly in the parking lot with another woman. The victim told the woman with Narcisse that she "could do better." Narcisse then said to the victim, " 'Shut up or I'll kill you, bitch,' " and around that time, the victim's companion asked Narcisse (in a joking tone, according to the victim) what he planned to do with his knife. The victim and her companion then started to walk away toward the companion's car, when Narcisse stabbed the victim from behind. The victim tried to fight him off but fell to the ground, and Narcisse kneeled over her. The victim's companion screamed at Narcisse to get off the victim, hit him, and said she was going to call the police. Narcisse went toward the victim's companion with his knife, but he then ran away.

Other witnesses provided different accounts of the night's events, and some of their testimony supported a theory that Narcisse may have acted in self-defense. The

woman who was with Narcisse outside the bar testified that she did not see him with a knife that night, although she acknowledged that he owned a knife and often carried it with him for use in the outdoors. According to her, the victim and her companion walked by, gave Narcisse a "really, really, nasty, mean look," and the victim looked as if she disliked Narcisse. She stated that the victim and her companion jumped Narcisse from behind after he told her (the woman he was with) that the victim and her companion were " 'crazy.' "

Narcisse testified on his own behalf. He denied stabbing the victim, bumping into her in the bar, or saying anything rude or insulting to her. He stated that he had previously owned a knife, but he had lost it and did not have one with him that night. He testified that the victim and her companion walked past him after the bar closed and yelled profanities at him and the woman he was with. He stated that the victim's companion grabbed a flint that was hanging out of his pocket on his keychain, and he responded by clutching her hand. Narcisse testified that the companion left after a brief struggle, but about a minute later he "got hit upside the head a whole bunch of times" from behind with what felt like a hard object. He crouched, then fell to the ground after his left knee hit the car in front of him. He testified that he then crawled in between two cars while the victim and her companion "kicked and stomped on" him.[2] Narcisse claimed that he was eventually able to stand up, grabbed the victim by her throat, pushed her against a wall, grabbed her left wrist, and "begged her to stop, stop hitting me." Whereas both the victim and her companion testified that neither one of them was armed, Narcisse testified that the victim's companion had a knife and told him, " 'I'm gonna cut you, motherfucker.' " He testified that he let go of the victim and kicked the victim's companion to prevent her from cutting him, and the victim cut the back of his jacket with a box cutter. He stated that he then punched the victim in the face, and she fell into her companion (who still had a blade in her hand) and onto the ground. He took that as his "cue to get out of there" and left the scene, not realizing that the victim was bleeding or

---

[2] A police officer testified that when Narcisse was taken into custody three days after the stabbing, he showed no physical signs that he had been in a fight.

severely injured. Narcisse theorized at trial that the victim's companion accidentally cut the victim when she fell onto her, and his trial attorney argued this theory to the jury during closing arguments.

The woman with Narcisse in the parking lot testified that she saw blood on the ground after the fight, but she "never saw any cuts," and she did not know how the bloody wounds were inflicted. The prosecution played for the jury a recording of an interview the police had with this woman shortly after the incident. According to a transcript of the recording, the woman told an officer that "they really did attack him" and that Narcisse "really was defending himself." She also said that Narcisse did "too much defending" and that she had yelled at the top of her lungs at him to " 'get off of her [the victim].' " She also told the officer that "he was attacked by two women. He did defend himself. I mean, there's no doubt that he, in my opinion, went way overboard" but that "he did not instigate this."

During closing arguments, the prosecutor pointed out that the People had the burden to prove that Narcisse did not act in self-defense, and she explained how the evidence satisfied this burden. She argued that Narcisse was not presenting a "traditional" self-defense theory, and that instead, it was "kind of this creative hybrid somewhere in between third party culpability, somebody else did this, accident kind of element of self-defense mixed in there." Defense counsel argued during his closing remarks that jurors should have a reasonable doubt about Narcisse's guilt because the victim might have been injured in a "friendly fire" type of accident. In her rebuttal, the prosecutor stressed the unlikelihood that events unfolded the way Narcisse had described.

Before any witnesses had testified at trial, the prosecution requested that the jury be instructed with the standard CALCRIM instructions on self-defense. Toward the end of the trial, during a discussion of jury instructions, the prosecutor stated that she did not think that Narcisse was, in fact, claiming self-defense, but acknowledged that the People had the burden to prove he did not act in self-defense. The court stated that because Narcisse had testified that the victim and her companion had attacked him and that he

4

feared for his life, the evidence supported giving self-defense instructions, and defense counsel did not object.

The jury was thereafter instructed with the standard CALCRIM instructions on self-defense. Specifically, they were told the elements of lawful self-defense in a nonhomicide case (No. 3470), the conditions that must be met for a person who engages in mutual combat or who starts a fight to claim a right to self-defense (No. 3471), and the fact that the right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist (No. 3474). Jurors also were instructed with CALCRIM No. 3472, which provides in full: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." In this timely appeal, Narcisse's sole argument is that the trial court committed reversible error by giving this instruction because it was not supported by the evidence and was prejudicial.

## II.
### DISCUSSION

Narcisse argues that we may consider his claim of instructional error notwithstanding his failure to raise it below because, according to him, it affects his substantial rights. "[T]he failure to object to an instruction in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error. (Pen. Code, § 1259; [citations].) Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Anderson* (1994) 26 Cal.App.4th 1241, 1249.) We thus review the asserted instructional error to determine whether Narcisse was prejudiced, and, because we conclude that he was not, we disagree that his substantial rights were affected.

5

Narcisse acknowledges that the challenged instruction was a correct statement of the law. (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 278 (*Frandsen*).) He contends, however, that there was not substantial evidence (i.e., evidence that he provoked a fight) to support it. On this point, we agree with him. Respondent argues on appeal that the evidence that Narcisse had bumped the victim and physically threatened her earlier in the evening provided substantial evidence that Narcisse "sought a quarrel." But below, the prosecutor claimed that the stabbing was instigated by taunting in the parking lot by the victim and her companion. The prosecutor admitted that the victim and her companion "verbal[ly] abuse[d]" Narcisse, but stressed that "[y]ou can say whatever you want to someone," and that "[y]ou don't get to stab people no matter what they say to you, ever." To the extent the prosecutor mentioned Narcisse bumping into the victim earlier in the bar, it was to establish that the victim had reason to dislike Narcisse and to provide context why she would taunt him as she left the bar—not to establish that Narcisse had started a fight and had no right to defend himself later in the parking lot.

Our conclusion that substantial evidence does not support the instruction, however, "does not warrant our finding reversible error because the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application." (*Frandsen*, *supra*, 196 Cal.App.4th at p. 278 [rejecting challenge to instructing jury with CALCRIM No. 3472].) Here, jurors were specifically instructed, under CALCRIM No. 200, that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We have no reason to believe that jurors ignored this direction to disregard inapplicable instructions. (*Frandsen* at p. 278.)

This conclusion is also consistent with the holdings of *People v. Crandell* (1988) 46 Cal.3d 833 (*Crandell*) and *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*), which both rejected arguments almost identical to the one Narcisse makes here. In *Crandell*, our Supreme Court agreed with defendant that there was no evidence to support

6

giving an instruction that the right to self-defense is unavailable to one who seeks a fight with the intent to create a real or apparent need to exercise self-defense. (*Id.* at p. 872.) But the court concluded that although the instruction should not have been given, the error was harmless because it was "confident the jury was not sidetracked by the correct but irrelevant instruction, which did not figure in the closing arguments." (*Id.* at pp. 872-873.) *Olguin*, another case involving an instruction that a person may not initiate a quarrel to create the necessity of self-defense, relied on *Crandall* when it rejected the defendant's argument that he was prejudiced by giving the instruction where the evidence did not support it. (*Olguin* at p. 1381.) As in *Crandall* and *Olguin*, the challenged instruction here did not figure into closing arguments, and "we don't see how" the instruction might have kept the jury from evaluating Narcisse's defense, which was that the victim's companion accidentally stabbed her after *they* started a fight with Narcisse. (*Olguin* at p. 1381.)

We acknowledge that there are a few decades-old (and rarely cited) cases that lend support to Narcisse's position. In *People v. Conkling* (1896) 111 Cal. 616 (*Conkling*), a man erected a fence to block access to a road he controlled across land that had been used by defendant and others. (*Id.* at pp. 619-620.) Defendant later tore down the fence, used the road, then shot and killed the man when defendant encountered him on a return trip across the road. (*Id.* at p. 620.) The jury was instructed on self-defense principles, including that " 'while it is true that an honest apprehension of danger to life or limb may justify a man for taking the life of another, yet that apprehension must arise out of a reasonable cause; but a cause which originates in the fault of the person himself, in a quarrel which he has provoked, or in a danger which he has voluntarily brought upon himself by his own misconduct, cannot be considered reasonable or sufficient in law to support a well-grounded apprehension of imminent danger to his person.' " (*Id.* at pp. 624-625.) Our Supreme Court reversed defendant's conviction for first degree murder, concluding that the broadly worded instruction could have misled the jury into believing that defendant lacked a right to self-defense because he had removed the obstruction on the victim's road, even if the victim attacked him while he later traveled

the road.  (*Id.* at pp. 619, 625.)  We do not believe that the modern summary of the law set forth in CALCRIM No. 3472 was so broadly worded or confusing that jurors would have been misled in this case, especially because, again, they were expressly told to disregard any instructions that they found did not apply to the facts.

In *People v. Campanella* (1940) 39 Cal.App.2d 384 (*Campanella*), the court reversed a conviction for second degree murder based in part on the fact that the jury was instructed that a defendant does not have the right to claim self-defense if he started a fight to contrive a reason to use force, where there was no evidence that defendant had sought such a quarrel.  (*Id.* at pp. 385, 387-388.)  And in *People v. Rogers* (1958) 164 Cal.App.2d 555 (*Rogers*), the court reversed a conviction for second degree murder because of instructional error, based in part on the fact that the evidence did not support an instruction that a person who starts a fight cannot claim self-defense unless he " 'decline[s] further combat' " and abandons the fight.  (*Id.* at pp. 557-558.)

It is frankly difficult to reconcile these older cases (*Conkling*, *Campanella*, and *Rogers*) with the more recently decided *Crandell*, *supra*, 46 Cal.3d 833, *Frandsen*, *supra*, 196 Cal.App.4th 266, and *Olguin*, *supra*, 31 Cal.App.4th 1355, none of which cited the older cases.  In fact, few published cases have *ever* relied on the older cases, at least not in analyzing error in instructing on principles of self-defense.  *Campanella* has been cited in only three published cases, most recently in 1950.  (*People v. Garnier* (1950) 95 Cal.App.2d 489, 496.)  *Rogers* also has been cited in only three published cases, most recently in 2007, when the Sixth District relied on it in analyzing whether a jury was properly instructed on the issue of " 'mutual combat,' " an instruction Narcisse does not challenge in this case.  (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045-1046.)  *Conkling* has been cited more frequently, but usually for its alternative holding that jurors commit misconduct when they conduct independent research (111 Cal. at p. 628).  (E.g., *People v. Collins* (2010) 49 Cal.4th 175, 247; *People v. Pierce* (1979) 24 Cal.3d 199, 207; *People v. Vigil* (2011) 191 Cal.App.4th 1474, 1483; *Bell v. State of California* (1998) 63 Cal.App.4th 919, 931.)

We consider it to be well settled that an appellate court presumes that jurors understood and faithfully followed the jury instructions (*People v. Homick* (2012) 55 Cal.4th 816, 866-867), and we see no reason to depart from this principle or to decline to follow *Crandell*, *Frandsen*, and *Olguin*. We do not share Narcisse's concern that the challenged instruction likely misled jurors into concluding that Narcisse had no right to self-defense in the parking lot if they believed he bumped into the victim in the bar earlier in the evening. The focus of closing arguments was whether the jury should believe Narcisse's theory that the victim's companion accidentally stabbed the victim. The prosecutor never claimed Narcisse started a fight to create an excuse to use force, as contemplated by CALCRIM No. 3472. And Narcisse himself did not claim he stabbed the victim in self-defense, but rather that someone else accidentally stabbed the victim. We conclude that any error in giving the challenged instruction was not prejudicial.

## III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.

9