Filed 6/17/14  P. v. Hernandez CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FREDDIE HERNANDEZ,<br><br>    Defendant and Appellant. | F066556<br><br>(Super. Ct. No. BF143148A<br><br>**O P I N I O N** |

-ooOoo-

### THE COURT\*

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Chung Mi (Alexa) Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Kane, Acting P.J., Detjen, J., and Franson, J.

A jury convicted appellant, Freddie Hernandez, of making criminal threats (Pen. Code, § 422;[1] count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), and infliction of corporal injury upon a spouse or cohabitant (§ 273.5, subd. (a); count 3), and in a separate proceeding the court found true allegations appellant personally used a deadly or dangerous weapon in committing the count 1 and count 3 offenses (§ 12022, subd. (b)(1)), and that, as alleged in connection with each count, he had suffered two "strikes"[2] and that he had served a prison term for a prior felony conviction (§ 667.5, subd. (b)). On count 3, the court imposed a prison term of 25 years to life, plus one year on the accompanying weapon use enhancement. The court imposed, and stayed pursuant to section 654, a term of 25 years to life plus one year on the weapon enhancement on count 1, and a 25-year-to-life term on count 2. The court struck the prior prison term enhancements as to all three counts.

On appeal, appellant argues that (1) the court erred in instructing the jury with CALCRIM No. 852, which deals with the jury's consideration of evidence of uncharged domestic violence, because the evidence was insufficient to establish appellant committed an uncharged act of domestic violence, and (2) this court should correct an error in the abstract of judgment. We order that an amended sentencing minute order and an amended abstract of judgment be prepared—albeit to correct errors other than the one claimed by appellant—and in all other respects affirm.

---

[1]    Except as otherwise indicated, all statutory references are to the Penal Code.

[2]    We use the term "strike" as a synonym for "prior felony conviction" within the meaning of the "three strikes" law (§§ 667, subds. (b)-(i); 1170.12), i.e., a prior felony conviction or juvenile adjudication that subjects a defendant to the increased punishment specified in the three strikes law.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Instant Offenses*

In June 2012,[3] appellant and Anna Valdivia were living together in the house at 2647-1/2 Kentucky Street (the house) in Kern County, along with James Hernandez (James), who is Valdivia's son and appellant's stepson, James's girlfriend and James's two children. Appellant and Valdivia are the parents of a 27-year-old daughter.

Valdivia testified to the following. On June 18, appellant arrived home at approximately 2:00 a.m. He appeared to be intoxicated. He and Valdivia drank some beer, Valdivia prepared some food, and as the two were eating, Valdivia accused appellant of being unfaithful and the two began arguing. At some point thereafter, the two were in the living room and Valdivia told appellant to go to bed because he was drunk. Appellant and Valdivia, who were both intoxicated at the time, began yelling at each other.

James testified to the following. Appellant was not at home on June 17 at noon when James arrived home from an outing with his girlfriend and children. Appellant came home around 2:00 a.m. the next day. By that time, Valdivia, who had been drinking beer "probably the whole day," had "probably" consumed a "[c]ouple [of] 12 packs" of beer. She was accustomed to drinking alcohol and she was "just buzzed."

James was asleep at approximately 3:30 a.m. when his girlfriend awakened him and told him Valdivia "was yelling or crying or something." James heard yelling and his mother crying. He ran to the living room, where he saw his mother sitting on the couch and appellant "on top of her." It "looked like [appellant] was going to hit [Valdivia]." Appellant had one hand on Valdivia's stomach and one hand raised in the air.

---

[3]    Except as otherwise indicated, all references to dates of events are to dates in 2012.

3

Appellant's upraised hand was "[k]ind of closed," "[p]robably like a fist," and Valdivia was crying. Both Valdivia and appellant were "intoxicated." James "ran over and pushed [appellant] off [Valdivia] and hit him a couple [of] times." Appellant "rolled over onto the side of her, … got up and … took off out the door." As appellant fled, a knife fell off the couch and landed on James's foot. Shortly thereafter, sheriff's deputies arrived. James did not see any injuries to his mother.

Kern County Deputy Sheriff Ernesto Alvarado testified he was dispatched to the house on June 18, where he spoke to James, who stated that when he ran into the living room he saw appellant "over [Valdivia]," holding a knife in his hand. James testified he did not recall telling a deputy he saw appellant holding a knife.

Valdivia testified she called 911. A tape of the call was played for the jury, and a transcript of the tape indicates the following. Valdivia stated she "want[ed] to report an assault." She also stated appellant "tried to stick [her] with a knife" and "socked [her] in [the] head."

Kern County Deputy Sheriff Standish Knowlton testified that on June 18, in response to a dispatch call, he went to the house where he spoke with Valdivia. She appeared to be "upset" but not "heavily intoxicated." Valdivia told the deputy the following. She and appellant had argued in the living room. During the argument appellant punched her three or four times in the head. Thereafter, appellant went to the kitchen, retrieved a knife, reentered the living room, said, "I will kill you," and began "jabbing and pok[ing] her in the stomach" with the knife. Next, he "put the knife to … [the] left side of her throat." When Valdivia felt "pressure from the knife on her neck," she thought appellant was going to kill her. She began screaming, at which point James entered the living room and "broke up the altercation."

Valdivia, however, testified to the following. At no time during her argument with appellant on June 18 did appellant push her, "use any sort of physical force towards

4

[her]," point a knife at her, hit her in the head, put a knife to her throat, or threaten to kill her. Valdivia did not tell Deputy Knowlton she thought appellant would kill her. She made many claims about appellant to Knowlton and said the things she said during the 911 call because she was angry at appellant. She "[m]ost likely" got the bump on her head when she tripped and fell. She is "always tripping" because she has glaucoma and "can't see at nighttime," and she was drunk at the time.

Valdivia further testified to the following. Appellant returned later in the morning on June 18, at which time, although she was no longer upset with appellant, she told him "it wasn't a good idea" for him to live in the house because James was upset with him. Appellant left and "stayed gone for a while." James testified that approximately one month after the June 18 incident, appellant came back to the house to live.

Deputy Knowlton testified he went back to the house on September 11 and made contact with Valdivia, at which time she told him the June 18 incident was a "nightmare," the account she gave that day was not true, she and appellant "were in an argument regarding a relation problem," and she and appellant had been "just playing around." She explained that her "recollection of what happened on June 18" was different than the account she had previously given the deputy because "she was mad at [appellant] because she believed he was cheating on her."

Audio recordings of telephone calls between appellant and Valdivia made while appellant was incarcerated in Kern County Jail were played for the jury. In one of these calls appellant told Valdivia "to keep calling down to the attorney's office" and directing Valdivia to "[t]ry to … get these charges dismissed …." Valdivia testified she agreed that she and appellant "were talking about [her] attempt to not want to press charges," and that she still wanted the charges dismissed. During the telephone call, Valdivia made multiple references to "the last time," as in the following exchange:

5

"[Valdivia]: … I'll just go in there and tell [them] that … I don't want to press charges. And I don't even wanna, I don't want [nothing] I just don't want to testify or nothing.

"[Appellant]: I know [because] that didn't happen I mean, you know?

"[Valdivia]: Yeah….yeah and they can't make me so.

"[Appellant]: Yeah.

"[Valdivia]: Uh-huh, like last time babe same shit we went through."

### Uncharged Acts Evidence

Valdivia, when asked about the references in the telephone call to "the last time," indicated she was referring to an incident that occurred on November 2, 2010, when she called the police and "[t]hey tried to get [appellant] for assault …." She further testified to the following. On the day of that incident, she and appellant had been drinking together. At one point, after they had gone to a store to buy cigarettes and "more beer," they were walking down an alley and Valdivia had to urinate. She went to a "corner [of] the alley," pulled her pants and underwear down, and "went to the bathroom." However, because she was "pretty intoxicated," she "couldn't get up," and when appellant tried to help her up, Valdivia fell on her back and appellant "fell on top of [her]." At some point thereafter, two men "came around the corner," walking toward appellant and Valdivia, and asked Valdivia if appellant "was hurting [her]." She "said no." The men "were [telling appellant] to get off of her, get off of her," and she "told [appellant] to leave because they probably think you're trying to hurt me, and [she] was scared that they were going to do something to [appellant]." Appellant ran away.

The following exchanges occurred in the prosecutor's direct examination of Valdivia:

"Q. Did [appellant] try to get on top of you when you were on the ground?

"A. He didn't try. No, he didn't."

6

"Q.    Isn't it true that you told the [investigating] officer [appellant] came on to you and it went too far?

"A.    No, I didn't say that."

"Q.    Isn't it true you told the [investigating] officers that [appellant] pushed you down?

"A.    No, I didn't say that."

"Q.    Did you scream?

"A.    … I don't remember screaming."

### *Procedural Background*

Prior to trial, the People filed a memorandum of points and authorities stating, "The People seek to introduce evidence of [appellant's] prior acts of domestic violence pursuant to Evidence Code section 1109 …."  At the pretrial hearing on the People's request, the prosecutor specified that the People wished to introduce evidence of "an arrest involving [appellant] and [Valdivia] back in 2010."  The prosecutor explained: "The facts of the [2010 incident] involve the defendant committing an assault while attempting to rape Ms. Valdivia in an alley when there were several witnesses [whose attention was] called to … a woman screaming in the alley that a man was trying to take her pants down …."  Over defense objection, the court ruled the evidence admissible under Evidence Code section 1109 and was not made inadmissible by Evidence Code section 352.

During a discussion of jury instructions between defense counsel, the court and the prosecutor after the defense had rested, defense counsel argued that the court should not give CALCRIM No. 852, which deals with the jury's consideration of evidence of uncharged domestic violence, on the ground that there was "no evidence" appellant committed a prior act of domestic violence.  The court rejected this argument, finding, "… I do think that there is sufficient evidence to support the giving of the instruction in

7

this particular case." Thereafter, the court instructed the jury in the language of CALCRIM No. 852, in relevant part, as follows:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically an alleged assault on Anna Valdivia in 2010.

"Domestic violence means abuse committed against an adult who was a cohabitant or person with whom the defendant has had a child.

"Abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

"[¶] … [¶]

"You may consider this evidence only if the [P]eople have proved by a preponderance of the evidence that the defendant in fact committed the uncharged act of domestic violence.

"[¶] … [¶]

"A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit the domestic violence and, based on that decision, also conclude that the defendant was likely to commit the crimes charged here.

"If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged here.

"[¶] … [¶]

"Do not consider this evidence for any other purpose except for the limited purpose described in this instruction."

## DISCUSSION

### CALCRIM No. 852

Appellant contends the trial court erred in instructing the jury pursuant to CALCRIM No. 852 because, he asserts, the evidence was insufficient to establish that in the 2010 incident he committed an act of domestic violence. We agree.

"A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.] At the same time, instructions *not* supported by substantial evidence should not be given. [Citation.] 'It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]' [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.)

To justify the giving of CALCRIM No. 852, the prosecution was required to establish by a preponderance of the evidence that appellant committed an act of domestic violence, i.e., "abuse," as defined in section 13700, against a cohabitant or a person with whom he had had a child. (Evid. Code, § 1109; Pen. Code, § 13700.) Abuse consists of "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (§ 13700, subd. (a).)

As indicated above, the prosecutor, in arguing for admission of the uncharged act evidence prior to trial, represented that "The facts of the [2010 incident] involve the defendant committing an assault while attempting to rape Ms. Valdivia in an alley when there were several witnesses [whose attention was] called to … a woman screaming in

9

the alley that a man was trying to take her pants down ….” The evidence presented fell far short of this. The only evidence of the 2010 incident was Valdivia’s testimony. There was no evidence Valdivia accused appellant of trying to remove her pants, and Valdivia testified she did not remember if she screamed. Rather, the evidence, considered in the light most favorable to the prosecution, showed, at most, the following: Valdivia was lying on her back in an alley, with her pants and underwear down, and appellant was on top of her. Two men came into the alley, observed this scene, asked Valdivia if appellant was hurting her, and ordered appellant to get off of her. Soon thereafter, appellant fled. This evidence was not sufficient to establish it was more likely than not that appellant, in the 2010 incident, committed an act of domestic violence. Therefore, giving CALCRIM No. 852 was error.

We turn now to the question of whether the error compels reversal. When a court errs by giving a correct instruction that has no application to the facts of the case, the error “does not appear to be of federal constitutional dimension.... [¶] The error is therefore one of state law subject to the traditional *Watson* test (*People v. Watson* (1956) 46 Cal.2d 818, 836) .... Under *Watson*, reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred.” (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130 (*Guiton*).)

Appellant argues that giving CALCRIM No. 852 was prejudicial because (1) the jury requested a readback of the testimony of the two deputy sheriffs, which indicated, according to appellant, that the jury was comparing Valdivia’s testimony with Deputy Knowlton’s testimony as to statements Valdivia made to him, and that conviction was not a “foregone conclusion”; (2) the deputies’ testimony was not particularly strong evidence of guilt because neither deputy was a percipient witness to the events of June 18; and (3) the prosecutor, in questioning Valdivia, “insinuated” that appellant attempted to rape Valdivia.

10

These points are not well taken. The testimony of Deputies Knowlton and Alvarado of statements made by, respectively, Valdivia and James, close to the time of the events in question constituted strong evidence of appellant's guilt, and the jury's request for a readback does not suggest otherwise. Further, appellant has not established that the jury concluded from the prosecutor's questions that appellant sexually assaulted Valdivia. As appellant acknowledges, the court instructed the jury that what the attorneys say is not evidence. We reject appellant's contention that another instruction given by the court, viz., that questions asked by the attorneys "are significant only if they helped you understand the witness' answers," was somehow contrary to CALCRIM No. 852. As indicated earlier, we presume jurors follow the court's instructions. More fundamentally, however, appellant's argument fails for the following reasons:

"[G]iving an irrelevant or inapplicable instruction is generally '"only a technical error which does not constitute ground for reversal."' [Citation.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67.) "[T]he jury is presumed to disregard an instruction if the jury finds the evidence does not support its application." (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 278.) This is because jurors are "as well equipped as any court to analyze the evidence and to reach a rational conclusion," and thus their "own intelligence and expertise" will save them from relying on a factually inadequate theory. (*Guiton*, *supra*, 4 Cal.4th at p. 1131.) Moreover, the court instructed the jury that "[s]ome of the instructions may not apply depending on your findings about the facts of the case," and "[a]fter you've decided what the facts are, follow the instructions that do apply to the facts as you find them." CALCRIM No. 852 itself told the jury to disregard the uncharged act evidence entirely if the People did not prove the act by a preponderance of the evidence. Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. (*People v. Romo* (1975) 47

11

Cal.App.3d 976, 990, disapproved on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208, 213-214.)

When we apply the forgoing principles, we conclude that even though CALCRIM No. 852 was lacking in evidentiary support, the jurors' "own intelligence and expertise" would lead them to conclude that the People had not shown by a preponderance of the evidence that appellant committed an uncharged act of domestic violence and would have disregarded entirely the evidence of the 2010 incident. Appellant has thus not demonstrated that it is reasonably probable that the outcome of the trial would have been more favorable to the defense had the challenged instruction not been given.

***Correction of Abstract of Judgment and Sentencing Minute Order***

Appellant contends "the abstract of judgment shows that six strike priors were charged and found to be true," and that this constitutes clerical error which this court should correct. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["Courts may correct clerical errors at any time"].) Appellant suggests, as best we can determine, that sentence was imposed on only two strikes, and that the abstract should reflect this.

Some background explanation is required. In the instant case, it was alleged in the information that appellant had suffered two prior felony convictions that qualified as strikes. The information alleged these strikes *as to each of the three counts*, and thus the information contained a total of six strike allegations. The court found each of these allegations true and imposed sentence under the three-strikes law on all three counts, although execution of sentence was stayed on two of the three counts.

Thus, in some sense, sentence was imposed on six strike allegations, and this is what the abstract shows—or attempts to show—in item No. 3, the section designated for "ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTIONS OR PRISON TERMS (mainly in the PC 667 series)." The designation "PC 667(e)>2012," an apparent reference to the three strikes law, appears six times. This is the basis for

12

appellant's claim that the abstract erroneously shows that the court found six strike allegations true.

The abstract contains errors, but not quite the errors appellant claims.  First, item No. 3 is the place on the abstract form for showing time either imposed or stayed *on* certain *enhancements*.  Problems with the abstract arise from the fact that a strike is not an enhancement.   (See *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 527 ["The Three Strikes law ... articulates an alternative sentencing scheme for the current offense rather than an enhancement"].)  Strictly speaking, where a defendant has suffered one or more strikes, sentence is not imposed *on the strike*.  Rather, sentence is imposed *on the substantive offense conviction*, and that sentence is determined under the three strikes law.  Therefore, item No. 3 is not the section of the form for indicating a defendant's strikes or that he or she has been sentenced under the three strikes law.  The fundamental problem with item No. 3 on the abstract in the instant case is not that it shows appellant was sentenced on six strikes, but that it contains any reference at all to appellant's strikes.  A new abstract should be prepared eliminating all references to appellant's strikes from item No. 3.

Second, item No. 6—the section for indicating indeterminate terms—which indicates a 25-year-to-life sentence was imposed on count 3 only, is in error.  As indicated above, a term of 25 years to life was imposed on each of the three counts, not just count 3.  The amended abstract should show, in item No. 6, that a term of 25 years to life was imposed on counts 1, 2 and 3.  (As is also indicated above, sentence was stayed on counts 1 and 2 pursuant to section 654.  That fact is correctly indicated in item No. 1 of the abstract.)[4]

---

[4]     The unfeasibility of using item No. 3 to indicate the sentence imposed "on" strikes is further demonstrated by the fact that item No. 3 calls for the court to indicate for each enhancement the "TIME IMPOSED," if that time is not stayed.  If time imposed under

Third, as indicated above, prior prison term enhancements (§ 667.5, subd. (b)) were alleged and found true as to each of the three counts and each was stricken by the trial court. Item No. 3 directs, "DO NOT LIST ANY STRICKEN ENHANCEMENT(S)." The amended abstract should eliminate all references in item No. 3 to the prior prison term enhancements.

Fourth, to show that appellant was sentenced under the three strikes law, item No. 8 should be completed so that it shows appellant was sentenced pursuant to sections 667, subdivisions (b) through (i) or 1170.12.

Finally we note that the January 15, 2013, sentencing minute order erroneously fails to indicate that the punishment for the prior prison term enhancements alleged in connection with each of counts 1 and 2 was stricken.

## DISPOSITION

The trial court is directed to prepare an amended sentencing minute order and an amended abstract of judgment consistent with the views expressed in this opinion and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

---

the three strikes law is shown in item No. 3, and time imposed under the three strikes law is *also* shown in item No. 6, as it should be, the abstract will be incorrect. For example, in the instant case, if item No. 3 showed an unstayed term "on" appellant's strikes of 25 years to life, it would indicate, incorrectly, that the 25-year-to-life term was imposed *in addition* to the unstayed 25 years to life imposed under the three strikes law on count 3, which is correctly indicated in item Nos. 6 and 1. And what would be indicated in the "TIME IMPOSED" box on the abstract form for each of the two strikes alleged in connection with count 3 upon which the unstayed 25-year-to-life term was based? Should the form show 25 years to life for both strikes? Or only for one? Either option would be confusing and would inaccurately represent the sentence imposed.

14