Filed 8/14/14  P. v. Rios CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALMA DELIA RIOS,<br><br>    Defendant and Appellant. | D065786<br><br><br>(Riverside Super. Ct. No. RIF1103257) |

APPEAL from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Reversed.

David L. Annicchiarico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

Alma Rios appeals from a judgment convicting her of assault with a deadly weapon and corporal injury to a coparent with enhancements for personal infliction of great bodily injury and deadly weapon use. She argues: (1) the trial court erred in refusing to instruct on self-defense; (2) the trial court erred in refusing to admit evidence on self-defense; and (3) defense counsel provided ineffective representation by failing to proffer evidence on intimate partner battering. She also asserts there was insufficient evidence to support the great bodily injury enhancements, and portions of a protective order issued by the trial court were invalid.

We conclude the court erred in refusing to instruct on self-defense and accordingly the judgment must be reversed. Given our reversal, we need not address the issues concerning the court's evidentiary rulings, intimate partner battering, and the protective order.[1] We also hold there was sufficient evidence to support the jury's finding of great bodily injury, and thus this allegation may be retried.

FACTUAL AND PROCEDURAL BACKGROUND

The incident underlying the charges against defendant occurred in the early morning hours of May 22, 2011, when defendant assaulted her boyfriend (Daniel

---

[1] Defendant has also filed a petition for writ of habeas corpus based on her trial counsel's failure to present evidence on intimate partner battering, and has filed a motion to consolidate the appeal with the habeas corpus petition. We deny the motion to consolidate. We have considered the habeas corpus petition with this appeal. Given our reversal in this appeal, by separate order we deny the habeas corpus petition as moot.

2

Martinez) on the property where they live with Daniel's parents.[2]  At the time of the commencement of trial in June 2012, Daniel was age 17; defendant was age 19; they had a two-year-old child; and defendant was pregnant and almost ready to deliver their second child.

The prosecution's witnesses included victim Daniel; defendant's cousin (Marcos Trejo) who witnessed the incident; Daniel's brother (Luis) who called 911 and saw Daniel immediately after the incident; the deputy sheriff who interviewed Daniel and Trejo at the scene; and the physician who treated Daniel at the hospital.

*Trial Testimony of Victim Daniel and Eyewitness Trejo*

Daniel and Trejo testified that on May 21 at around 9:30 p.m., they walked with defendant to a birthday party a few blocks from their home.  They each drank about eight or nine beers at the party; Daniel and Trejo also smoked marijuana; and they were all drunk.  According to Daniel, he and defendant were arguing because defendant thought he was "ditching her" for his friends and she wanted to leave the party to go home to check on their child, whereas he did not want to leave.  Defendant would come and pull him aside to talk to him, and he would "just turn [his] back on her and walk away."  They were mad at each other, and defendant kept getting in his way, "blocking [him from] where [he] wanted to go" to get more drinks to bring to his friends.  When he asked her to move out of his way, she said no and told him he had already had enough to drink.  Starting at about 12:30 a.m., they continued arguing for about 30 minutes.  As the

_____

2    We refer to Daniel Martinez by his first name to distinguish him from his brother Luis Martinez who also testified at trial.

argument escalated, defendant started cursing and yelling at Daniel "outrageously" and "making a scene" in front of everyone.

When one of Daniel's friends was leaving, Daniel and defendant decided to walk outside to say goodbye to the friend. Defendant said they should go home, and she tried to shove Daniel out the gate while he was trying to go back inside to the party. To get defendant out of his way, Daniel shoved her away, causing her to slip and fall to the ground. When she got back up, Daniel tried to push her chest with his head, and when he did so he "accidentally headbutted her in her upper lip." Defendant started crying and told Daniel she was hurt, and Daniel told her he did not mean to hit her. Defendant was angry, she pushed Daniel away, and they separately returned to the party. Trejo pulled Daniel aside and had him take a walk to calm down. The head-butting caused swelling to defendant's lips. Daniel acknowledged at trial that he was intoxicated, angry, frustrated, and violent when he assaulted defendant.

After the head-butting incident, Daniel saw defendant wandering around the party; she appeared angry and was avoiding him. Daniel's friends told him to "[c]ome back and have fun" and relax. About two or three hours after the head-butting incident (sometime between 3:00 a.m. and 5:00 a.m.), Daniel told defendant he was ready to leave. Defendant responded that Daniel was "screwed" because she was not going to leave now and he had to wait until she wanted to leave. Daniel stayed at the party for about 20 more minutes; defendant continued to refuse to leave with him and told him they were "over"; and Daniel "just took off" and walked home with Trejo. Daniel and Trejo went to a trailer located in back of Daniel's house, where Trejo lived with his mother. Trejo's

4

mother was sleeping in the living room, and Trejo and Daniel went to Daniel's bedroom where they were talking and laughing and eating pizza.

About 10 minutes later, defendant arrived at the trailer and started arguing with Daniel, asking him why he had left her. She appeared "mad or sad" to Trejo, and she told Trejo to "look at her lip." Daniel told her they should not talk about it because they were drunk and they should go to sleep. As defendant continued to argue with Daniel for a few more minutes, Trejo "tried to split it up, tried to make [them] go different ways just for the night." Explaining Trejo's attempt to intervene, Daniel testified that Trejo "interfered in our private space and stuff. He got in the way. He shoved—he pushed me back and said calm down. He told us—told Alma the same. He said just go sleep in the other room and let Daniel sleep here with me. I'll talk to him." Defendant was angry; she told Daniel she was very disappointed in him because he was drunk; and she left the bedroom and went into the kitchen, saying "oh, I'm going to hurt you. Watch. We're done. We're broken up . . . ." Daniel thought defendant was "just angry and just saying stuff that she didn't even know what she was saying."

About one to three minutes later, defendant arrived at the bedroom door holding a knife in her hand. Daniel described the knife as a six-inch butter knife, and Trejo described it as a kitchen knife. She was holding the knife in her hand "down low," "normally" like a person would hold a pencil. Daniel was surprised, asked her what she was going to do with it, and said they should "talk it out . . . before anything happened." Defendant just stood quietly at the bedroom door looking at him, and she then entered the bedroom and stood a few feet away from the door without advancing towards Daniel.

5

She was still upset with him because of the head-butting, and she continued arguing and crying, saying her face hurt and "look what you did [to] me. . . . Look at my face . . . ." Daniel told her to put the knife down; she was "making a fool" of herself; and she should go to sleep. When asked how he felt when he saw defendant with the knife, Daniel described a variety of different thoughts, including she wanted to kill him, she did not want to hurt or kill him because she loved him, she was too drunk to do anything to him, she was trying to scare him, and she was scared for her life and probably thought he was going to physically hurt her because he had already "accidentally hurt her" at the party.

Initially Daniel was going to try to walk out of the room; he testified he could have walked out the door and was not afraid to do so even though defendant had a knife in her hand. However, he then decided he should just take the knife from her "to help her out" and so she would "not do anything stupid." He also acknowledged he might not have walked out the door because he was angry and drunk. Trejo tried to stand between defendant and Daniel to separate them, and defendant said to Trejo, " '[w]hose side are you on?' " Daniel started moving closer to defendant and throwing pillows at her to distract her so he could "tackle her down to take away the knife."

Daniel walked towards defendant as he was throwing the pillows, and defendant raised the knife and started "attacking the pillows" as they were in the air. Trejo, who was standing to the side, told Daniel to calm down and told defendant to leave the room. As Daniel was throwing the last of three pillows, he made his move to tackle defendant. As he tackled her, her hand was up by her shoulder and she accidentally struck him with the knife once on the head. Daniel elaborated that he ducked down, sprinted towards her

6

as fast as he could and grabbed her, and as he tackled her he "slammed her" against a closet and they both fell to the ground. Similarly, Trejo testified that Daniel reacted to seeing the knife by tackling defendant and holding her down, and they hit the closet and fell to the ground. Daniel testified he then took the knife and tossed it aside down the hallway.

Daniel got up and started yelling at defendant, asking her what was wrong with her. He picked her up; started carrying and pushing her "to go to the kitchen and calm down"; and tried to take her outside to go to his parents' house. At one point on cross-examination, he acknowledged he was still angry, frustrated, drunk and violent, and that defendant appeared afraid and was crying. Trejo's mother came to the kitchen, and when told what happened, she had defendant stand in a corner of the kitchen. Daniel testified he did not realize he was cut, but when Trejo told him he was bleeding, he checked his head, found he had a "little scratch," and used a blanket to put pressure on his head.

Trejo went to Daniel's parents' house and told Daniel's brother, Luis, that Daniel had been stabbed. Luis called 911 and Daniel was taken to the hospital by ambulance.

Daniel acknowledged at trial that he was still in a relationship with defendant, he loved her, and he did not want her to get into trouble. Trejo testified that during the altercation in the bedroom when defendant asked him whose side he was on, he was "shocked" and was put in a "tough situation" because defendant was his cousin and Daniel was his friend.

*Testimony of Responding Officer Based on Interviews and Observations at Scene*

When the authorities arrived at the residence in response to the 911 call, defendant was standing in the backyard holding a large kitchen knife to her neck and "just kind of staring forward . . . ." She was not crying and did not appear to be "shaken up" or nervous. After Deputy Christopher Wicker repeatedly ordered her to drop the knife and she did not comply, he deployed his taser. She released the knife, fell to the ground, and was arrested. Because she had been tased, defendant was taken to the hospital where she was cleared for booking.

When Deputy Wicker interviewed Daniel at the scene of the incident, Daniel appeared nervous, and "a little shaken up" and scared. Daniel told the deputy that he and defendant had gone to a party and had an argument; when they returned home the argument continued in the back room of a trailer; and defendant left the room and returned holding a "small kitchen knife." To avoid any further problems Daniel attempted to walk out of the room, and as he turned his back to defendant he "felt a strike in the back of his head." When Daniel turned around and asked defendant what she had done, she just "walked out laughing." Daniel felt he was bleeding, so he picked up a towel or blanket and covered his head. Daniel told the deputy that he wanted defendant to be prosecuted.

When Deputy Wicker interviewed Trejo at the scene, Trejo said defendant and Daniel were arguing; defendant was upset and angry; and defendant yelled at Daniel " 'I'm going to fucking kill you.' " Defendant went out of the room and returned with a "small steak knife." When Trejo tried to get in between them, defendant said, " 'You're

8

my cousin. You better have my back.' " Defendant then "struck [Daniel] in the back of the head" three times and walked out of the trailer laughing.

*Additional Testimony Regarding the Knife and Daniel's Injury*

Deputy Wicker testified he found a knife on the floor in the bedroom where the incident occurred and he observed blood on the blade. A photo of the knife and the knife itself (which was apparently eight inches long) were admitted into evidence.[3] Deputy Wicker testified he was told the knife was used in the assault, but he acknowledged no forensic testing was performed on the knife to tie it to the assault. When shown the knife at trial, Daniel and Trejo testified they did not recognize it.

Relevant to the great bodily injury enhancement, Daniel testified his injuries from the knife were minor; the blood was "pouring slowly down" and there was not a lot of blood; and he put coffee grounds on the wounds to stop the bleeding. Trejo testified he saw "blood coming down" and "squirting out," and he assessed defendant was bleeding "a little." Defendant's brother Luis told the 911 operator that Daniel was bleeding "a lot" and he had blood "all over his back, all over his front shirt, [and] . . . all over his head." Deputy Wicker testified he saw three "small lacerations" on the back of Daniel's head.

The doctor who treated Daniel at the hospital testified Daniel had three small, one-centimeter stab wounds. Two of the wounds were in the back of his head, and one was

---

3    The list of exhibits included in the clerk's transcript states the knife was eight inches long. In closing arguments, the prosecutor argued no butter knife was found and the knife found in the bedroom had "an edge where it can cut something." Defense counsel argued there was no knife with blood on it submitted into evidence, and the only evidence in this regard was Deputy Wicker's unsubstantiated testimony.

on the left temple area. The wounds were not life threatening but they each required a staple to close them. The stapling procedure is accomplished by first numbing the area with a liquid "to take a little of the edge off of the staple being driven into [the] skin" and then opening the stapler, putting it against the skin, and squeezing. The staple stays on the wound for about one week. The physician elaborated the wounds were probably at the "lower limit" of the size he would close with a staple, and if they had been half a centimeter he probably would have left them open. On cross-examination, the doctor explained scalp wounds have a tendency to bleed profusely because the scalp tends to be "a little more vascular" than other parts of the body, and the size and severity of a scalp wound cannot be determined by the amount of bleeding.

*Jury Verdict and Sentencing*

The jury found defendant guilty of assault with a deadly weapon (count 1) and corporal injury to a coparent (count 3), with enhancements for personal infliction of great bodily injury (counts 1 and 3) and personal use of a deadly or dangerous weapon (count 3). The jury acquitted her of making a criminal threat (count 2). The court granted her three years' probation on the condition that she serve one year in jail. The court also issued a protective order restricting her behavior towards Daniel.

DISCUSSION

I. <em>Trial Court's Refusal To Instruct on Self-Defense</em>

Based on Daniel's testimony that defendant accidentally cut him with the knife as he lunged towards her and tackled her to the floor, the trial court instructed the jury on the defense of accident. In addition to the accident defense, defense counsel requested

10

instruction on a self-defense theory. The trial court refused the request, reasoning the head-butting incident occurred two to three hours before defendant went to the bedroom armed with the knife; defendant had already confronted Daniel in the bedroom without arming herself; and there was no evidence (other than Daniel's speculation) that she needed to return with the knife to defend herself.

Defendant contends the court erred in declining to instruct on self-defense, arguing the evidence could support that she reasonably feared Daniel was going to injure her as he tackled her to the ground, particularly since he had injured her earlier that night when he head-butted her.

### A. *Governing Law*

Upon request by the defendant, a trial court is required to instruct on a defense that is supported by substantial evidence, even if it is inconsistent with another defense presented by the defendant. (*People v. Elize* (1999) 71 Cal.App.4th 605, 615; *People v. Villanueva* (2008) 169 Cal.App.4th 41, 49.) When deciding whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the evidence, but only whether there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt of guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) The court must "take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief. . . .' [Citation.] ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.". . . .' [Citation.] Even so, the test is not whether *any* evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that 'deserve[s]

11

consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded" ' that the specific facts supporting the instruction existed."  (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.)

If the evidence raises a reasonable doubt that the defendant acted in self-defense, the prosecution has the burden to show the nonexistence of self-defense beyond a reasonable doubt.  (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 570-571; *People v. Adrian* (1982) 135 Cal.App.3d 335, 340-341; see CALCRIM No. 3470.)  To support a claim of self-defense, the defendant must honestly and reasonably believe there is a threat of imminent bodily injury.  (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.)  Self-defense is limited to the use of such force as is reasonable under the circumstances.  (*Id.* at p. 1065.)  "[A]lthough the test is objective, reasonableness is determined from the point of view of a reasonable person in defendant's position.  The jury must consider all the facts and circumstances it might ' "expect[] to operate on [defendant's] mind . . . ." [Citation.]' "  (*Ibid.*, brackets in original.)

The doctrine of self-defense may not be invoked by a defendant who initiated a physical assault and thereby made the victim's attack legally justified, unless the defendant communicated to the victim that he or she has abandoned the assault.  (*People v. Booker* (2011) 51 Cal.4th 141, 182; *People v. Randle* (2005) 35 Cal.4th 987, 1001-1002; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 272-273; *People v. Nem* (2003) 114 Cal.App.4th 160, 165-166.)  However, if the initial aggressor/defendant acted with *nondeadly force*, and the victim responded with such sudden and deadly force that the defendant could not withdraw, then the defendant may defend with deadly force without

withdrawing.  (*People v. Crandell* (1988) 46 Cal.3d 833, 871-872; *People v. Quach* (2004) 116 Cal.App.4th 294, 297, 301-303; *People v. Frandsen, supra*, 196 Cal.App.4th at pp. 273-274; see CALCRIM No. 3471.)  On the other hand, if the initial aggressor/defendant acted with *deadly force*, the defendant's inability to withdraw from a sudden counterattack by the victim does not resurrect the right to self-defense.  (See *People v. Nem, supra*, 114 Cal.App.4th at p. 166.)

## B.  *Analysis*

Drawing all inferences in favor of defendant's self-defense theory, we conclude there was sufficient evidence to support this theory and the jury should have received self-defense instructions.

According to Daniel's trial testimony, he was angry at defendant because she was trying to make him leave the party and he physically assaulted and injured her to thwart her attempts to make him leave.  A few hours after this volatile incident, defendant arrived at the trailer in an emotionally distraught state and confronted Daniel about the injuries he had inflicted on her and the fact he had left her at the party.  When she first arrived at the trailer unarmed, the exchange between her and Daniel escalated to the point that Trejo pushed Daniel back and told both Daniel and defendant to calm down.  Given that Trejo felt the need to physically stop Daniel, the jury could infer that Trejo was trying to prevent Daniel from again assaulting defendant.  Defendant then left and returned with a knife held down low.  Defendant was arguing and crying about her face hurting, but she did not advance towards Daniel.  In response, Daniel again exhibited

13

aggressive behavior as he threw pillows at defendant, and it was only at this point that defendant raised the knife in defensive fashion towards the pillows.

Although defendant elected of her own volition to return to the bedroom, the jurors could find her intent was not to assault Daniel, but rather she wanted him to understand how upset she was and that he had physically and emotionally hurt her. Further, the jurors could reason that she did not feel safe returning to the bedroom without some type of protection given that Daniel had assaulted her and injured her face earlier that night, and a few minutes earlier he had responded to her arrival by moving towards her in an aggressive fashion. Under these circumstances, the jury could reasonably conclude defendant was not acting as an aggressor when she initially returned to the bedroom with the knife but was merely taking protective measures for her own safety. Further, the jurors could deduce Daniel was not truly afraid of her even though she had a knife, as reflected by his acknowledgement she had reason to fear him because of his prior assaultive behavior and he felt free to leave the room but he elected not to do so.

Similarly, the jurors could have found that when Daniel started throwing pillows at defendant and then lunged towards her and tackled her, she reasonably thought he wanted to hurt her, and she reacted reasonably by using the knife to stop his assaultive conduct. Alternatively, even if the jury deemed her the initial aggressor, the jury could conclude her holding of the knife in a lowered position without advancing towards defendant did not rise to the level of a threat of deadly force, and she could legitimately

14

use the knife in self-defense when Daniel suddenly escalated the conflict by tackling her to the ground.

Although the jury may well have rejected a self-defense theory based on the fact Daniel was not pursuing defendant at the time she returned to the bedroom with the knife, we cannot say no reasonable jury could conclude she acted in self-defense. The jury could have premised a self-defense finding on the overall circumstances showing an ongoing heated argument between Daniel and defendant; Daniel had assaulted and injured defendant earlier in the evening and he reacted with a physically aggressive stance when she arrived at the trailer unarmed; when defendant entered the bedroom a second time with the knife, she was holding it down and did not advance towards Daniel; and she did not inflict injury on him until he lunged at her in close quarters and tackled her to the ground. It was the jury's job to sort out which of the conflicting inferences was persuasive. The trial court erred by refusing to instruct on self-defense.

We also reject the Attorney General's contention that the instructional error was harmless. Regardless whether we apply the prejudice standard used for federal constitutional error or the less stringent state law standard urged by the People, the error requires reversal.[4] Notably, the jury rejected the allegation of criminal threats,

---

[4]    The state law reasonable probability of a different outcome standard generally applies to the refusal to instruct on a defense; however, the federal constitutional harmless beyond a reasonable doubt standard may apply if the error deprived the defendant of the right to present a complete defense. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089; *People v. Rogers* (2006) 39 Cal.4th 826, 868, fn. 16, 872; see also *People v. Salas, supra*, 37 Cal.4th at p. 984.) Given our reversal even under the state law standard, we need not discuss defendant's contentions that the failure to instruct on self-

apparently finding defendant either did not threaten to harm Daniel, or if she did, she was merely expressing her anger at him and did not mean for Daniel to take it seriously. There is a reasonable probability the jury might also have found a self-defense claim persuasive based on the factual circumstances and inferences we have delineated above. Also, the jury could deduce that Daniel's version of events provided to the officer at the scene was not complete in that he left out the information about his own aggression because he was afraid of getting into trouble.

Further, the jurors' rejection of the accident defense does not show there is no reasonable likelihood they would have accepted a self-defense claim. The court properly instructed on accident principles, and for the reasons set forth above was also required to instruct on self-defense. The accident and self-defense theories were premised on two distinct versions of the facts: one in which Daniel lunged towards defendant and defendant accidentally inflicted the wounds, and the other in which Daniel lunged towards defendant and she intentionally but justifiably inflicted the wounds. The jury's rejection of the accident defense does not, standing alone, indicate that the jury rejected Daniel's trial testimony that he lunged and tackled defendant; that is, the jury could have credited the testimony about the tackle, but found defendant used the knife intentionally rather than accidentally. Further, the jury's finding that defendant intentionally rather than accidentally stabbed Daniel does not shed any light on how the jury might have viewed a claim that her intentional conduct was justified had it been instructed on self-

defense requires automatic reversal, or that the error equates with the failure to instruct on an element of the charges.

16

defense principles. Thus, the jury's resolution of the accident defense does not illuminate the likelihood of defendant prevailing on a self-defense theory.

Given our reversal based on the refusal to instruct on self-defense, we need not evaluate the court's evidentiary rulings, defense counsel's failure to proffer evidence on intimate partner battering, and the propriety of the challenged portions of the protective order. These are matters that may be addressed at retrial should the need arise.

II. *Sufficiency of the Evidence for Great Bodily Injury Enhancements*

Even though we are reversing the judgment, for purposes of double jeopardy we consider defendant's challenge to the sufficiency of the evidence to support the great bodily injury enhancements.

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid*.) If the circumstances reasonably justify the jury's findings reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Ibid*.)

The enhancement statute for personal infliction of great bodily injury defines great bodily injury as "a significant or substantial physical injury." (Pen. Code, § 12022.7, subd. (f).) "[D]etermining whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be

17

resolved by the jury. [Citations.] ' "A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description." ' [Citations.] Where to draw that line is for the jury to decide." (*People v. Cross* (2008) 45 Cal.4th 58, 64.) Although the injury must be more than trivial or moderate, it need not be so grave as to cause the victim permanent or prolonged bodily damage. (*Ibid*.) Great bodily injury may be established by evidence of the severity of the injury, the resulting pain, or the medical care required to treat or repair the injury. (*Id*. at p. 66.)

Defendant asserts that Daniel was only "minimally" cut with the knife and no reasonable jury could find he suffered anything more than moderate injury. We are not persuaded. Daniel suffered three distinct cuts to his head; the wounds caused substantial bleeding; one of the wounds was in the temple area which approaches the facial area; and he was taken to the hospital where the doctor stapled the wounds. The nature of the injury and the required medical intervention were sufficient to support a jury finding that the wounds constituted great bodily injury. To support her challenge to the jury's finding, defendant points to various facts that could support a contrary conclusion, including Daniel's assessment that his wounds were minor and the doctor's testimony that scalp injuries tend to bleed profusely and the wounds were close to the size that did not require stapling. The evidence cited by defendant does not conclusively defeat the evidence that supports the jury's conclusion. Also, defendant's suggestion that the facts here are akin to those in *People v. Martinez* (1985) 171 Cal.App.3d 727 is not persuasive. On appeal, the *Martinez* court found insufficient evidence of great bodily injury in a case where the victim was cut " 'a little bit' " in his back through several layers of clothing, including a

18

heavy coat; the victim was not taken to the hospital; and the prosecutor had moved to strike the great bodily injury allegation on the basis that the evidence showed the knife wound " 'was almost like a pinprick.' " (*Id*. at pp. 735-736.) Unlike the situation here, *Martinez* did not involve evidence of heavy bleeding and stapling of three distinct wounds, including a temple wound.

Defendant may be retried on the great bodily injury enhancements.

DISPOSITION

The judgment is reversed.


                                                            HALLER, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.


19