Filed 3/23/15  P. v. Buttelo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C068381 |
| v. | (Super. Ct. Nos. 08F10072, 07F11996, 09F07953) |
| JOSEPH BUTTELO, | |
| Defendant and Appellant. | |

Defendant Joseph Buttelo, a Norteño gang member, fired multiple .45-caliber rounds into the side of a van, killing one of the occupants and wounding another.  The confrontation began when the van pulled up to defendant on the street and Gustavo Lopez, a Sureño gang member seated in the front passenger seat, asked if he was a "chapete," a derogatory term used by Sureños to refer to their Norteño counterparts.  Defendant responded by asking Lopez if he was a "scrap," a similarly derogatory term for a Sureño.  After a brief exchange of insults, Lopez appeared to grab an object, opened the passenger door, and attempted to step out of the van, at which point defendant pulled a handgun from his waistband.  Lopez shut the door and said:  "He has a gun.  He has a gun, go."  Defendant opened fire as the van drove away.  One of the rounds struck Lopez

1

in the back. Another round struck Jonathan Gaeta, seated directly behind Lopez, in the right leg. Lopez died of his injuries.

Charged with first degree murder (Count 1) and attempted first degree murder (Count 2), defendant was convicted by jury of the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter. (Pen. Code, §§ 192, subd. (a), 664/192, subd. (a).)[1] The jury also found defendant personally used a firearm in the commission of these offenses (§ 12022.5, subd. (a)), but did not commit these offenses for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in criminal gang activity (§ 186.22, subd. (b)).[2] The trial court sentenced defendant to serve an aggregate determinate prison term of 23 years, 4 months (upper term of 11 years for voluntary manslaughter, plus a consecutive upper term of 10 years for the firearm enhancement attached to that count, plus a consecutive term of one year (one-third the middle term) for attempted voluntary manslaughter, plus a consecutive term of one year, 4 months (one-third the middle term) for the firearm enhancement attached to that count) and imposed other orders.[3]

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant was acquitted of one count of attempted murder and of the lesser included offense of attempted voluntary manslaughter (Count 3) and one count of malicious and willful discharge of a firearm at an occupied motor vehicle (Count 4), charged in relation to a separate shooting incident that occurred about two weeks before the incident underlying Counts 1 and 2.

[3] By order of this court, defendant's notice of appeal in superior court case No. 08F10072 (involving the above-described convictions) was construed to include case Nos. 07F11996 (involving a conviction for possession of marijuana) and 09F07953 (involving a conviction for possession of a stabbing instrument while at the Sacramento County Jail). Defendant was sentenced on each of those cases at the same sentencing hearing. Sentences imposed in case Nos. 07F11996 and 09F07953 were ordered to be served concurrently with the sentence imposed in case No. 08F10072. The facts underlying case Nos. 07F11996 and 09F07953 are not relevant to the issues raised on appeal and are not discussed.

On appeal, defendant contends: (1) the prosecutor engaged in prejudicial misconduct during his closing argument to the jury by misstating the law regarding self-defense; (2) the trial court coerced a verdict in violation of his rights under the federal Constitution when it ordered the jury to continue deliberating after it indicated a deadlock on Counts 1 and 2 without inquiring as to whether there was a reasonable probability the jurors could agree on a verdict; and (3) the trial court erred in calculating defendant's entitlement to presentence custody credit.

We disagree with the first two contentions. While certain misstatements were made by the prosecutor, in light of the entire closing argument, we conclude there is no reasonable likelihood the jury misconstrued or misapplied the comments to lighten the prosecution's burden of proving its case beyond a reasonable doubt. We also conclude the trial court did not coerce a verdict in this case. We partially agree with defendant's claim he is entitled to two additional days of presentence custody credit. As the Attorney General concedes, defendant is entitled to the additional days of credit with respect to case No. 07F11996. However, defendant appears to argue this credit must also be applied to the sentence imposed in case No. 08F10072. Not so. He served the two days solely on the charges brought in case No. 07F11996, over a year before he was arrested in case No. 08F10072. Thus, the two days for which defendant seeks credit were attributable solely to case No. 07F11996, and not to case No. 08F10072. Accordingly, we modify the judgment to award the additional credit in case No. 07F11996 and affirm the modified judgment. We also direct the trial court to correct the abstract of judgment to reflect the years in which defendant's crimes were committed.

FACTS

In October 2008, defendant was a member of the Norteño street gang. He began associating with Norteño gang members when he was 14 or 15 years old and became more entrenched in the gang lifestyle as he became an adult. He routinely wore red, the color claimed by his gang, and threw up gang signs when he saw members of the rival

3

Sureño street gang.  By doing so, he was "representing" his gang and "disrespecting the other side."  An exchange of gang signs by rival gang members, often accompanied by an exchange of insults, could lead to anything from a fist fight to a more serious confrontation involving weapons.  Defendant began carrying a gun one or two months before the shooting incidents involved in this case.  Because only one such incident resulted in conviction, we confine our factual recitation to that incident.

On October 31, 2008, around 8:30 p.m., defendant was heading to a friend's house on Lerwick Road in the Arden-Arcade area of Sacramento.  Considering his destination to be Sureño territory, defendant wore a red long-sleeve shirt beneath a black t-shirt and carried a loaded .45-caliber handgun for protection.  As defendant walked down Edison Avenue towards Lerwick Road, he came across two friends, Jessica Orsie and Jimmy Cromaty, who also lived at the house he intended to visit.  Orsie and Cromaty were walking to the liquor store to buy alcohol.  Defendant joined them.  On the way back from the liquor store, defendant acted "nervous, paranoid a little bit," and told Orsie:  "If something happens, just continue to go.  Just keep walking."  The threesome reached Lerwick without incident, but about four houses up the road, a green van passed them, came to a stop, and after making a three-point turn, pulled up beside defendant and his companions.

The driver of the van was Jerardo Chairez.  Gustavo Lopez was seated in the front passenger seat.  Jonathan Gaeta and Humberto Barajas were seated in the back of the van.  Chairez and his passengers were trying to get to a Halloween party, the location of which Lopez claimed to know.  After telling Chairez to turn on Lerwick, Lopez realized they were on the wrong street and told him to turn around.  It was after the van turned around that Lopez noticed defendant and his friends walking up the street.  Lopez, a member of the Sureño street gang, rolled down his window and told Chairez to slow down.  When Chairez pulled up, Lopez asked defendant:  "Are you a chapete?"  Lopez appeared to be angry.  Defendant responded:  "Are you a scrap?"  This initial exchange of accusatory

4

questions turned into a brief, but heated argument, lasting only a few seconds. The argument ended when Lopez appeared to grab an object from the floor board, opened the passenger door, and started to get out of the van. Defendant took a step back and pulled the handgun from his waistband. When Lopez saw the gun, he "jumped back in" the van and said: "He has a gun. He has a gun, go."

The first shot was fired before Chairez could press down on the gas pedal, and when he did hit the gas, the tires spun on the wet roadway for about three seconds as multiple bullets hit the van. When the van gained traction, Chairez drove away at a high rate of speed. Defendant fired at least four rounds into the van. One of the rounds penetrated the passenger side door and hit Lopez in the back as he turned away from defendant. Another round penetrated the van's sliding door and hit Gaeta, seated directly behind Lopez, in the right leg below the knee. Orsie and Cromaty ran to their house as the shooting started. Defendant followed as the van drove away. When defendant got to the house, he went into a back room and hid the gun under his friend's mattress. Meanwhile, Chairez drove to a nearby gas station, went inside, and called 911. Barajas stayed in the van with Lopez and Gaeta. Law enforcement and medical personnel arrived a short time later. Lopez and Gaeta were transported to the hospital. Lopez died of his injuries.

Defendant testified in his own defense. He admitted being a Norteño gang member. He admitted carrying a loaded .45-caliber handgun the night of the shooting because he was in a Sureño neighborhood. He admitted shooting into Chairez's van after engaging in a gang-related argument with Lopez. His defense was that he fired in self-defense after he saw something in Lopez's hand. He explained: "I saw something in his hand and it looked like he was gripping it. It looked small to me. I can't say with any certainty what it was." The fact Lopez appeared to grab an object inside the van was corroborated by Orsie and Cromaty. Orsie testified the object looked like a "baton or billy club." Cromaty testified the object appeared to be "black and heavy." In contrast,

5

Chairez testified Lopez did not have anything in his hands when he opened the passenger door and started to step out of the van. Chairez also testified there were no weapons in his van the night of the shooting. Gaeta and Barajas each testified they could not see whether Lopez grabbed anything prior to the shooting. A search of the van revealed no gun, pipe, bat, rod, or baton. However, there was a red steering wheel lock bar.

## DISCUSSION

## I

### *Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in prejudicial misconduct during his closing argument by misstating the law regarding self-defense. While we agree certain misstatements were made by the prosecutor, viewed in light of the entire closing argument and the jury instructions, we conclude there is no reasonable likelihood the jury misconstrued or misapplied the comments to lighten the prosecution's burden of proving its case beyond a reasonable doubt.

### A.

### *Additional Background*

During his closing argument to the jury, the prosecutor argued: "So let's talk about self-defense as it applies to all charges, because [defendant] would have you believe that he acted in self-defense on two separate occasions, 15 days apart, when he shot at two separate cars killing one person. That he was but an innocent victim. A man who[,] caught by circumstances[,] was forced to act with unfortunate results. [¶] What are the requirements for you to find [defendant] acted in self-defense? He has to have an honest belief in his own head in the need to use force to defend himself from immediate harm, okay. [¶] That belief must be reasonable. Would a reasonable person, would average Joe, believe the same thing? This is why we pick jurors from the community. Twelve citizens with different back[grounds], different lifestyles, different experiences. The twelve of you are the reasonable people. [¶] If [defendant] honestly believed he

6

needed to defend himself, is that normal, reasonable? [¶] And you have to find that [defendant] only used force that was reasonably necessary to defend himself against danger. The example of that is, you know, if you and I agree to go after school to the park and have a fight at 3 o'clock and I show up with a knife or a gun because I'm afraid that you're bigger than me and you are going to beat me up, that's not reasonable force. You can't bring a knife to a fist fight. You can't bring a gun to a knife fight. You can't use deadly force to protect yourself from non-deadly force."

At this point, defense counsel objected: "You can bring a gun to a knife fight, it's deadly force." Following a sidebar discussion, the trial court sustained the objection. The prosecutor continued: "You can't use deadly force to repel non-deadly force. That's the concept. Your use of force, if you have an honest reasonable belief in self-defense, it has to be reasonably related."

Turning to the Halloween shooting incident, the prosecutor argued the jury should believe the testimony of Chairez, Gaeta, and Barajas over that of defendant, Orsie, and Cromaty for a number of reasons. He then argued: "If you were to find honest and reasonable belief, you have to find that the reaction is reasonably related to the danger. The problem with that is a single occupant, if you believe that version, [Lopez] starting to get out of the van is not deadly force. There's nothing about that that presents such a high level of danger that you have to shoot. [¶] A pipe, baton, bat on somebody's lap, it's not deadly force. Again, even [Orsie] only assumed a fist fight and ran because she can't fight. There's nothing about this that says four gunshots into a vehicle is reasonable." Discussing the bullet trajectory evidence, the prosecutor argued defendant was not running away when he fired into the van, and stated: "He's not running because he's not scared. He's standing his ground and shooting at somebody who called him a chapete, and he hits him in the back. [¶] There's really no more cowardly way to kill a person. There's really no more cowardly way to act[,] to live a violent lifestyle, carry loaded guns, and use any excuse to shoot at people."

7

After discussing defendant's claim of self-defense with respect to the other shooting incident, the prosecutor argued: "Self-defense and imperfect self-defense, some additional thoughts. You don't have the option of either if you provoke a quarrel with the intent to use self-defense. And how that would apply is, if two people were to get into a screw you, no screw you type of an argument and you're provoking the fight and you're sort of part and parcel of this confrontation that's starting to escalate, you don't then get to say, well, hang on, he threw the first punch. [¶] No. No. You were part of the quarrel that was beginning, you don't then get self-defense." The prosecutor continued: "On the 31st, the chapete/scrap language, right? And the importance of this is -- you got the instruction this morning on the idea of offensive words, right. . . . [¶] If you use offensive words that you should expect to provoke a violent confrontation, which [the prosecution's gang expert] said chapete and scrap are it, you don't get self-defense. It doesn't apply."

At this point, defense counsel lodged another objection: "That misstates the law depending on circumstances." After the objection was overruled, the prosecutor continued: "You also don't have the option of self-defense or imperfect self-defense if you agree to mutual combat, right. My school yard fight. If you agree to meet at 3 o'clock after school and fight, you don't get to say, well, he punched me first, I get self-defense. You don't get to say he punched me first[,] so I pulled out a knife because he's bigger than me[,] so I get self-defense. [¶] No, you agreed to mutual combat. You don't get to escalate[,] certainly[,] the force. You don't get self-defense at all. You've agreed to the conflict."

## B.

### *Analysis*

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.] By contrast, our state law requires reversal when a

8

prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

While prosecutors are given wide latitude during argument (*People v. Wharton* (1991) 53 Cal.3d 522, 567), "it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.) Where the prosecutor's comments are ambiguous, the question is "whether there is a reasonable likelihood that the jury misconstrued or misapplied" the comments. (*People v. Clair* (1992) 2 Cal.4th 629, 663.)

Defendant argues the prosecutor's comments amounted to misconduct because there is a reasonable likelihood the jury would understand the comments to require them to conclude "self-defense was not available to [defendant] with respect to his shooting Lopez and Gaeta" solely because defendant "engaged in an exchange of offensive words with Lopez . . . . The prosecution had the burden of proving that the killing and attempted killing were not justified due to self-defense. [Citations.] Thus, the argument's effect is to misstate the law in a manner that has the effect of reducing the prosecution's burden of proving the absence of self-defense. Also, the argument was an improper way to attack an essential part of [the] defense."

Viewed in isolation, certain of the prosecutor's comments, i.e., "[i]f you use offensive words that you should expect to provoke a violent confrontation, . . . you don't get self-defense," and "[y]ou also don't have the option of self-defense . . . if you agree to mutual combat," are misstatements of law. As defendant correctly observes, " '[w]here a person seeks or induces a quarrel which leads to the necessity in his [or her] own defense of using force against his [or her] adversary, the right to stand his [or her] ground and thus defend himself [or herself] is not immediately available to him [or her], but, instead

9

he [or she] must first decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his [or her] adversary of his [or her] desire for peace and of his [or her] abandonment of the contest unless the attack is so sudden and perilous that he [or she] cannot withdraw. . . .' [Citation.]" (*People v. Quach* (2004) 116 Cal.App.4th 294, 302, italics omitted.) Thus, provoking a confrontation or agreeing to mutual combat does not, by itself, preclude the use of force in self-defense, but rather makes the propriety of using such force subject to additional requirements.

However, we do not view the prosecutor's comments in isolation. (*People v. Avila* (2009) 46 Cal.4th 680, 714.) Immediately before the challenged comments, the prosecutor stated: "You also don't have the option of [self-defense] if you provoke a quarrel *with the intent to use self-defense*." (Italics added.) This is an accurate statement of the law. Indeed, as the jury was properly instructed: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (See *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278.) It was during the prosecutor's attempt to explain this concept of contrived self-defense that he made the challenged comments. In context, we conclude the jury would have understood the challenged comments to include the implied qualification, *with the intent to create an excuse to use force in self-defense*.

Moreover, even if the jury was reasonably likely to misinterpret the challenged comments to preclude defendant from using force in self-defense if he exchanged insults with Lopez and thereby impliedly agreed to engage in mutual combat, the misconduct would be harmless. The jury was fully and accurately instructed on principles of self-defense, including the circumstances in which a mutual combatant may use force in self-defense. "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'

10

[Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 717.)  Nor is there any evidence in the record supporting the view defendant tried to withdraw from the confrontation between Lopez and himself, indicated to Lopez he wanted to withdraw, and gave Lopez a chance to withdraw, or that Lopez's attack on defendant was so sudden and perilous withdrawal was not possible.  Defendant's own testimony was that he fired upon the van as soon as he saw an unknown object in Lopez's hand.  Holding an unknown object does not amount to a sudden and perilous attack.  Furthermore, when defendant pulled out the handgun, it was Lopez who indicated a desire to withdraw from the confrontation by getting back in the van and telling Chairez to drive away.  Instead of allowing the withdrawal, defendant opened fire.  Thus, in addition to presuming, as we must, the jury followed the trial court's instructions and disregarded any contrary statements made by the prosecutor, we can also state with confidence that the jury likely rejected defendant's claim of self-defense, not because it believed a mutual combatant can never use force in self-defense, but because defendant did not meet the additional requirements placed upon a mutual combatant, as fully and accurately set forth in the instructions.

## II

### *Coercion of a Verdict*

Defendant contends the trial court coerced a verdict in violation of his rights under the federal Constitution when it ordered the jury to continue deliberating after it indicated a deadlock on Counts 1 and 2 without inquiring as to whether there was a reasonable probability the jurors could agree on a verdict.  We reject the contention.

### A.

### *Additional Background*

Presentation of evidence in defendant's trial spanned nine court days.  The jury deliberated for less than two days before a juror was removed and replaced by an alternate juror.  Following the substitution, the trial court instructed the jury to begin their deliberations anew.

11

During the first day of new deliberations, the jury requested and obtained playback of a 911 call relating to the first shooting incident, supporting the charges brought in Counts 3 and 4, of which defendant was acquitted. The jury also requested readback of certain testimony relating to this shooting incident. Readback of the requested testimony commenced the following morning. That afternoon, the jury announced it had reached a verdict on Counts 3 and 4. The trial court instructed the jury to sign the verdict forms for these counts and maintain possession of them until deliberations were complete for all counts.

The following day, the jury requested and obtained readback of defendant's testimony regarding the Halloween shooting incident, supporting the charges brought in Counts 1 and 2. The next day of deliberations, the jury requested clarification of the definition of second degree murder and expressed confusion as to the difference between second degree murder and voluntary manslaughter. The trial court referred the jury to CALCRIM Nos. 500, 520-522, 570-571, and 640. The afternoon of the following day, the jury announced it had reached a verdict on all counts. However, because the verdict forms were internally inconsistent, the trial court informed the jury it could not accept them.[4] The jury was sent home early and ordered to return the following day. Upon their return, the jury was re-instructed on filling out the verdict forms. About two hours later, the jury announced it had reached a verdict on Counts 3 and 4, but could not agree on Counts 1 and 2. That afternoon, the trial court accepted the jury's verdict of not guilty on Counts 3 and 4.

Immediately after accepting the verdict with respect to Counts 3 and 4, the trial court informed the jury: "I have a single additional instruction to read to you this

---

[4] For example, as the trial court explained on the record, "as to Count 1, there were signed verdict forms for guilty and not guilty of first-degree murder, guilty and not guilty of many of the lessers, all of which is obviously internally inconsistent."

12

afternoon. At the conclusion of this instruction, it's my intention to send you home today and bring you back tomorrow at 9:00. [¶] You all have had a long journey to this point. I could see on your faces it's not always been an easy journey to get here. I have significant sympathy for you in your positions. I think an afternoon away from the courthouse may have value for you." The trial court also advised: "I also want you to be thinking over the evening about anything additional I can provide you with relative to your efforts on Counts 1 and 2. [¶] For example, is there additional read back of a particular witness or witnesses that you think might be of value or assistance? [¶] Is there an additional point of law that could be clarified? [¶] Under certain circumstances I can even allow the lawyers to provide additional argument to you on a particular point if you could identify it? And I would certainly be willing to consider that if it were [an] appropriate issue upon which to address."

The trial court then instructed the jury with the following instruction, which we expressly approved in *People v. Moore* (2002) 96 Cal.App.4th 1105 (*Moore*):

"What I'm going to do right now, ladies and gentlemen, is I have further instructions and directions to give you as to this case.

"It has been my experience on more than [one] occasion that a jury which initially reported it was unable to reach a verdict was ultimately able to arrive at a verdict.

"To assist you in your deliberations, I'm going to further instruct you as follows: Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so.

"It is your duty as jurors to carefully consider, weigh, and evaluate all of the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs.

13

"You should not hesitate to change a view you've once held if you are convinced it is wrong or to suggest other jurors[] change their views if you are convinced they are wrong. Fair and effective jury deliberations require a frank and forthright exchange of views.

"As I've previously instructed you, each of you must decide the case for yourself and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors.

"It is your duty as jurors to deliberate with a goal of arriving at a verdict on a charge if you could do so without violence to your individual judgment.

"Both the People and the defendant are entitled to individual judgment of each juror. As I've previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

"May I [suggest] that since you've been unable to arrive at a verdict using the methods that you have chosen, that you consider changing the methods you have been following at least temporarily and try new methods.

"For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role playing by having those on one side of [the] issue present and argue the other side's position and vice versa. This might enable you to better understand the other's positions.

"By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations.

"You may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also suggest you reread CALCRIM Instructions 200 and 3550. These instructions pertain to your duties as jurors and make recommendations as to how you

14

should deliberate. The integrity of a trial requires that jurors at all times during deliberations conduct themselves as required by these instructions. CALCRIM Instructions 200 and 3550 define the duties of a juror.

"The decision the jury renders must be based on the facts and the law. You must determine what facts have been proved from the evidence received in the trial and not from any other source. The fact is something proved by the evidence or by stipulation.

"Second, you must apply the law I stated to you to the facts as you determine them and in this way arrive at your verdict. You must accept and follow the law as I state it to you regardless of whether you agree with the law.

"If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

"CALCRIM Instruction 3550 defines the jury's duty to deliberate. The decisions you make in this case must be based [on] evidence received in the trial and the instructions given by . . . the [C]ourt. These are the matters this instruction requires you to discuss for the purpose of reaching a verdict.

"CALCRIM Instruction 3550 also recommends how our jurors should approach their task. You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and instructions I have made in the instructions now presented to you. I hope my comments and suggestions may have [been] some assistance to you."

The jury was then released for the day and ordered to return the following afternoon to resume their deliberations. Immediately thereafter, defense counsel requested a declaration of mistrial, noting "at least two jurors start[ed] to cry" when the trial court ordered them to return the following day to resume their deliberations, and expressing concern "that if there is a verdict it's a product of coercion." The prosecutor responded by noting the jury "received only one read back from the [Halloween shooting

15

incident] and that was of the defendant. They have not requested any other read back or any other clarification on issues other than their one clarification on the difference between second [degree murder] and voluntary manslaughter where we rereferred them to instructions they already had without clarifying anything." The trial court denied the request to declare a mistrial.

The following afternoon, the jury resumed their deliberations and requested readback of defendant's testimony regarding the Halloween shooting. The requested readback occurred the next morning. The morning after that, the jury requested and obtained readback of the testimony of Orsie and Cromaty. The following morning, the jury announced it had reached a verdict on Counts 1 and 2.

**B.**

*Analysis*

Section 1140 provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

"The determination whether there is reasonable probability of agreement rests in the discretion of the trial court. [Citations.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' [Citation.]" (*People v. Breaux* (1991) 1 Cal.4th 281, 319.) "The question of coercion is necessarily dependent on the facts and circumstances of each case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 195-196.)

Defendant argues the trial court "abused its discretion in not questioning the jurors as to the probability of agreement before ordering further deliberations." We rejected the same contention in *Moore*, *supra*, 96 Cal.App.4th 1105. There, after one full day of

16

deliberations, the jury indicated it had reached a verdict on one of the counts, but could not reach a unanimous decision as to the remaining count. After the trial court delivered the same instruction given to the jury in this case, which we approved in *Moore*, the jury deliberated for another afternoon and part of a morning before reaching a verdict on the remaining count. (*Moore, supra,* at pp. 1118-1120.) Rejecting the defendant's argument that the trial court abused its discretion by "not ascertaining whether there was a reasonable probability the jurors could agree on a verdict," we explained: "[S]ection 1140 vests the trial court with discretion to determine whether there is a reasonable probability of agreement among jurors who have reported an impasse. [Citations.] In this case, and presumably because of the relatively brief duration of deliberations conducted by the jurors before they announced they could not reach a verdict on count one, the trial court concluded further deliberations might be beneficial without questioning the jury regarding the impasse. The fact the jury was able to reach a verdict relatively quickly after being further instructed reflects the court properly exercised its discretion." (*Moore, supra,* at pp. 1121-1122.)

Here, defendant argues: "Unlike *Moore*, in this case, at least two jurors exhibited emotional distress by starting to cry when the court ordered further deliberations. [¶] Also, unlike *Moore*, the jury had deliberated for more than five days, as opposed to only one day, before declaring its impasse." But, as defendant also observes, only three days were "devoted solely to deliberations on counts 1 and 2." Indeed, it appears the first two days were devoted exclusively to Counts 3 and 4. While five days of deliberation—three of which were devoted to Counts 1 and 2—is substantially longer than the one day of deliberation that occurred in *Moore*, we agree with the trial court's assessment this is "not an extensively long time period given the length of this trial." Defendant takes issue with the trial court's subsequent statement, "[w]e've been at this collectively for nearly a full month," noting that "due to delays in the proceedings, . . . [f]rom the beginning of the opening statements until the jury commenced deliberations, there were only 10 days of

17

trial." However, this observation does not diminish the trial court's conclusion that deliberations had not been extensively long. We also conclude the trial court appropriately focused on the fact the jury requested only one readback relating to the Halloween shooting incident. Defendant takes issue with this comment as well, pointing out there were other requests regarding the Halloween shooting incident "prior to one of the jurors being replaced." However, because the deliberations were required to begin anew when the juror substitution occurred, the trial court properly focused on post-substitution deliberations. We also note, following the instruction, the jury requested additional readback of testimony regarding the Halloween shooting incident and reached a verdict relatively quickly. There was no abuse of discretion.

Nor are we persuaded by the fact certain jurors showed emotion when ordered to return to their deliberations. Participating on a jury can be an emotional experience. (See *People v. Russell* (2010) 50 Cal.4th 1228, 1249.) In *People v. Keenan* (1988) 46 Cal.3d 478, during penalty deliberations in a capital murder case, one of the jurors voting for death issued a heated "diatribe" against the lone holdout juror, causing this juror to begin "crying and shaking" and leave for the restroom, where she may have vomited. (*Id.* at pp. 539-540.) The same day, the jury foreman sent two notes to the trial court. After the first note, which "suggested a juror was deviating from assurances made during 'jury selection' about ability to 'vote for the death penalty' " (*id.* at p. 533) the trial court re-instructed the jury on its sentencing powers and duties. (*Id.* at pp. 528-529.) After the second note, which stated, " 'we have a juror who cannot morally vote for the death penalty,' " the trial court informed the jury there would be an investigation into whether one or more jurors were refusing to follow the law. The trial court then released the jury for the weekend. The following Monday, the foreman was questioned and revealed multiple jurors did not recall being informed during voir dire that they would be required to vote on whether to impose the death penalty, but that had been resolved. Explaining the resolution, the foreman stated: " 'There was an apology. "I needed the weekend."

18

And that was it.' " The trial court ruled there would be no further investigation and allowed deliberations to continue after again instructing the jurors on their general duties. (*Id*. at pp. 529-531.)  After rejecting the defendant's argument that certain comments made by the trial court in response to the foreman's notes resulted in a coerced verdict (*id*. at pp. 533-535), our Supreme Court also rejected the argument the holdout juror's " 'objective' manifestations of stress, such as shaking, crying, and vomiting, may be considered as proof the verdict was improperly affected" by misconduct on the part of the juror who lost his temper and yelled at the holdout.  (*Id*. at pp. 539-542.)

Similarly, here, having concluded the trial court did not abuse its discretion in instructing the jury to resume deliberations without also inquiring as to the probability of reaching a verdict, the fact certain jurors became emotional at the prospect of further deliberations does not mean the resulting verdict was coerced.

Finally, defendant complains about the instruction itself, specifically:  (1) it "unduly focused the jury on matters other than the presumption of innocence"; (2) "the jury was not instructed not to give the . . . instruction undue consideration;" and (3) "although the . . . instruction admonished the jury that each juror must decide the case for himself or herself, the goal was to arrive at a verdict if it could do so without violence to their individual judgment, and that both the prosecution and defense were entitled to the individual opinion of each juror, it did not instruct the jurors not to surrender conscientiously held beliefs simply to secure a verdict."  In response to these complaints, we reiterate that the instruction was expressly approved in *Moore*, *supra*, 96 Cal.App.4th 1105, and we are not persuaded by defendant's attempts to undermine it now.

### III

### *Custody Credit*

Finally, defendant claims entitlement to two additional days of presentence custody credit.  The Attorney General concedes defendant is entitled to two days of credit with respect to case No. 07F11996, but not with respect to case No. 08F10072.  We agree

19

with the Attorney General, modify the judgment to award the credit, and affirm the modified judgment.

## A.

### *Additional Background*

With respect to case No. 07F11996, defendant was arrested on December 4, 2007, for possession of a large quantity of marijuana and spent two days in the Sacramento County Jail, at which point he was released on bond and then granted drug diversion on January 9, 2008.

With respect to case No. 08F10072, defendant was arrested on December 12, 2008, for the crimes described in this opinion and spent 883 days in presentence custody.

Defendant was sentenced on both cases on May 13, 2011.[5] As mentioned, he was sentenced to serve an aggregate prison term of 23 years, 4 months in case No. 08F10072. After reinstating criminal proceedings against defendant in case No. 07F11996, the trial court sentenced him to serve a concurrent term of two years in state prison.

The trial court awarded defendant 883 days of credit for time spent in actual custody and 132 days of conduct credit, for a total of 1015 days of presentence custody credit, without specifying the case or cases to which this credit applied. The abstract of judgment reflects this credit as applying only to case No. 08F10072, with no credit applying to case No. 07F11996.

## B.

### *Analysis*

Section 2900.5 provides in relevant part: "(a) In all felony and misdemeanor convictions, . . . when the defendant has been in custody, . . . all days of custody of the

---

[5]   As mentioned, defendant was also sentenced on a third case, case No. 09F07953, involving possession of a stabbing instrument while at the Sacramento County Jail. He makes no claim to presentence custody credit with respect to this case.

20

defendant, . . . shall be credited upon his or her term of imprisonment . . . . [¶] (b) For the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted. Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed."

"[T]he purpose of section 2900.5 is to ensure that one held in pretrial custody on the basis of unproven criminal charges will not serve a longer overall period of confinement upon a subsequent conviction than another person who received an identical sentence but did not suffer preconviction custody." (*People v. Bruner* (1995) 9 Cal.4th 1178, 1183-1184 (*Bruner*).)

Where a defendant is arrested and charged with multiple crimes in the same proceeding and concurrent sentences are ultimately imposed at sentencing, any "presentence time is credited against the term imposed on each crime" and "it makes no difference that the crimes were committed at different times. The credits become effective 'together' on each crime at the time of sentencing." (*People v. Adrian* (1987) 191 Cal.App.3d 868, 875-876; *Bruner*, *supra*, 9 Cal.4th at p. 1192, fn. 9 [where concurrent terms are imposed for multiple offenses in a single proceeding, "presentence custody is credited against all"].)

In *People v. Kunath* (2012) 203 Cal.App.4th 906 (*Kunath*), relied upon by both defendant and the Attorney General, our colleagues at the Second Appellate District extended this rule to the situation in which the defendant, who was arrested and charged with separate crimes in separate proceedings, was sentenced to serve concurrent terms in each case at the same sentencing hearing. The trial court declined the defendant's request to award presentence custody credits "in each case for the time he was simultaneously in presentence custody." (*Id*. at p. 909.) The Court of Appeal reversed. The court first discussed our Supreme Court's decision in *Bruner*, *supra*, 9 Cal.4th 1178, in which the defendant, during an arrest for parole violations, was found to be in possession of

21

cocaine. His parole was revoked and a 12-month sentence was imposed, with credit for time spent in custody following his arrest. Thereafter, while the defendant was serving his parole revocation term, he was charged with cocaine possession, convicted, and sentenced to serve a concurrent 16-month term for this crime. (*Id*. at p. 1181.) The trial court found the defendant was not entitled to any additional presentence credit. Our Supreme Court agreed, explaining: "[W]here a period of presentence custody stems from multiple, unrelated incidents of misconduct, such custody may not be credited against a subsequent formal term of incarceration if the prisoner has not shown that the conduct which underlies the term to be credited was also a 'but for' cause of the earlier restraint. Accordingly, when one seeks credit upon a criminal sentence for presentence time already served and credited on a parole or probation revocation term, he [or she] cannot prevail simply by demonstrating that the misconduct which led to his [or her] conviction and sentence was 'a' basis for the revocation matter as well." (*Id*. at pp. 1193-1194.) Thus, because the defendant in *Bruner* "received credit for all presentence custody in his parole revocation proceeding" and "failed to demonstrate that but for the cocaine possession leading to his current sentence, he would have been free, or at least bailable, during that presentence period," he was "not entitled to duplicative credit against the current sentence." (*Id*. at pp. 1180-1181.)

Distinguishing *Bruner*, the *Kunath* court explained: " 'The purpose of section 2900.5 is to equalize the total time in custody between those who suffered presentence custody on unproven charges and those who did not. [Citation.] That purpose is not served where, as in *Bruner*, a defendant in post-sentence custody is charged with another crime. In such a case, even if the defendant would otherwise be eligible for presentence release on the unproven charge, he [or she] cannot avoid being in custody. [¶] As our Supreme Court stated in *Bruner*: '[S]ection 2900.5 is intended to provide equitable treatment for one held in *pretrial* custody on mere *charges* of crime, not to give credit for time already being served and credited on another term or sentence for unrelated

violations. In this case, once defendant began serving a parole revocation term founded upon multiple unrelated acts of misconduct, his custody was unavoidable on that basis regardless of the fact that he was simultaneously awaiting trial on the single criminal charge. [Citation.]' [Citation.] [¶] Where, however, the defendant's custody is solely presentence on all charges and he is simultaneously sentenced on all charges to concurrent terms, the policy behind section 2900.5 applies. Presentence custody credits must apply to all charges to equalize the total time in custody between those who obtain presentence release and those who do not." (*Kunath*, *supra*, 203 Cal.App.4th at pp. 910-911.)

Defendant argues: "Since [he] had not been sentenced to any custody time in [case No.] 07F11996 before the concurrent sentences were ordered, *Kunath* supports that [he] is entitled to the 2 days of credit." We agree defendant is entitled to the two days of credit, applied to case No. 07F11996. But he is not entitled to have these two days applied to case No. 08F10072. Unlike *Kunath*, where the defendant was "simultaneously in presentence custody" on the two cases (*Kunath*, *supra*, 203 Cal.App.4th at p. 909), here, the two days of credit defendant seeks were attributable solely to case No. 07F11996, having been earned more than a year before defendant was arrested in case No. 08F10072. We do not read *Kunath* to hold all presentence custody credits earned in each case must be applied to both cases, regardless of whether the custody was attributable to both cases, because of the fortuity of a simultaneous sentencing hearing. Stated differently, where a defendant is simultaneously in presentence custody on two cases, as in *Kunath*, the custody can be said to be attributable to both cases, and where concurrent sentences are imposed in a simultaneous sentencing hearing, such custody must be credited against each sentence. Not so here, where two days were spent in presentence custody solely on case No. 07F11996, more than a year before defendant was arrested in case No. 08F10072.

23

Accordingly, with respect to case No. 08F10072, the trial court correctly awarded 883 days of credit for time spent in actual custody. Conduct credit in the amount of 132 days was also properly awarded pursuant to the 15 percent limitation of section 2933.1, subdivision (c), for a total of 1015 days of presentence custody credit. However, defendant is entitled to two days of credit for time spent in actual custody in case No. 07F11996. Defendant is not entitled to any conduct credit for time spent in presentence custody in that case. (See *People v. Ramos* (1996) 50 Cal.App.4th 810, 816-817 [defendant entitled to greatest whole number of days that do not exceed 15 percent of actual period of presentence confinement].)

## IV

### *Omission in the Abstract of Judgment*

In addition to modifying the judgment to award the custody credit described above, for which an amended abstract of judgment must be prepared, we also direct the trial court to include in that amended abstract of judgment the years defendant's crimes were committed, which the current abstract of judgment omits. Defendant's convictions in case No. 08F10072 are designated Counts 1A and 2A in the abstract of judgment. These crimes were committed in 2008. His convictions in case Nos. 09F07953 and 07F11996, for which he was sentenced at the same time as case No. 08F10072, are designated Counts 2B and 2C in the abstract of judgment. These crimes were committed in 2009 and 2007, respectively.

## DISPOSITION

In case Nos. 08F10072 and 09F07953, the judgments are affirmed. In case No. 07F11996, the judgment is modified to award two days of credit for time spent in actual custody, with no days of local conduct credit, for a total of two days of presentence custody credit. As modified, the judgment in case No. 07F11996 is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting the modification. This amended abstract of judgment shall also include the years defendant's crimes were

24

committed. The trial court is further directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

       HOCH    , J.

We concur:

     RAYE    , P. J.

    BLEASE  , J.